**SHELL OIL COMPANY and D. A. Shale, Inc., Plaintiffs,**

v.

**Thomas S. KLEPPE, Secretary of the Interior, Defendants.**

Civ. A. No. 74-F-739.

United States District Court, D. Colorado.

Jan. 17, 1977.

James B. Dean, Mosley, Wells & Dean, Denver, Colo., Fowler Hamilton, Cleary, Gottlieb, Steen & Hamilton, New York City, Donald L. Morgan, Cleary, Gottlieb, Steen & Hamilton, Washington, D. C., for plaintiff Shell Oil Co.

Norma L. Comstock, John W. Shiremen, Denver, Colo., Claron Spencer, Senior & Senior, Salt Lake City, Utah, for plaintiff D. A. Shale, Inc.

James L. Treece, U. S. Atty., Carolyn McNeill, Asst. U. S. Atty., Denver, Colo., Gerald S. Fish, Dept. of Justice, Washington, D. C., for defendants.

FINESILVER, District Judge.

This matter is before the Court on cross-motions for summary judgment. This case is another installment of the long-enduring and multi-faceted litigation over oil shale, a mineral principally located in the Western states. For the ten year history of oil shale litigation, see *The Oil Shale Corp. v. Udall*, 261 F.Supp. 954 (D.Colo.1966), *aff'd*, 406

F.2d 759 (10th Cir. 1969), *rev'd sub nom.,* *Hickel v. Oil Shale Corp.,* 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970), *conformed to, The Oil Shale Corp. v. Morton,* 370 F.Supp. 108 (D.Colo.1973), *remanded* Sept. 22, 1975 (10th Cir.), *cert. denied, The Oil Shale Corp. v. Kleppe,* 426 U.S. 949, 96 S.Ct. 3169, 49 L.Ed.2d 1185 (1976), *dec'n pending,* No. 8680 (D.Colo.).[1]

In the instant litigation, Plaintiffs seek judicial review of a decision of the Board of Land Appeals in the Department of Interior, *United States v. Frank W. Winegar, et al.,* IBLA 70–549, June 28, 1974, reported at 16 IBLA 112, 81 I.D. 370 (hereinafter *Winegar* ), in which plaintiffs' oil shale placer mining claims were held invalid on the ground that these claims did not constitute discoveries of a valuable mineral deposit pursuant to 30 U.S.C. § 22 *et seq.* We have reviewed the *Winegar* decision, the voluminous briefs, the extensive administrative record, and have undertaken our own independent research. Plaintiffs' Motion for Summary Judgment is GRANTED.

## I

The factual background of this litigation is set out in detail in *Winegar.* The six oil shale placer mining claims in dispute, Mountain Boy Nos. 6 and 7 and Harold Shoup Nos. 1, 2, 3, and 4, were located in 1917 under the Act of May 10, 1872, 30 U.S.C. § 22 *et seq.* The Mineral Lands Leasing Act, 30 U.S.C. § 181 *et seq.,* subsequently withdrew oil shale from location but preserved "valid claims existent on February 25, 1920, and thereafter maintained in compliance with the law under which initiated, which claims may be perfected under such laws, including discovery." 30 U.S.C. § 193. By various mesne conveyances, the plaintiffs acquired title to the claims.

The instant controversy began on September 8, 1964, when the Manager, Colorado Land Office, Bureau of Land Management, issued complaints on behalf of the

United States alleging the invalidity of the claims due to a failure to discover a valuable mineral deposit. The traditional standard for determining that a valuable mineral deposit had been discovered is whether or not a prudent person would be justified in believing the deposit could be developed, extracted, and marketed at a reasonable profit. *Freeman v. Summers,* 52 L.D. 201 (1927) (hereinafter *Freeman* ), held that *present* development and marketability at a reasonable profit is not necessary for deposits of oil shale. Rather, the claimant must only establish that the oil shale deposits constitute a valuable resource for *future* use and development.

Administrative Law Judge Dent D. Dalby found that the claimants did not meet the standard mining law test for a valuable resource. If he had been ruling as a matter of first impression, he would have determined the claims to be invalid. However, he found that the claimants had established that the oil shale deposits constituted a valuable resource for future use and development. Under the *Freeman* standard, he held all six claims to be valid, except for 35.4 acres of Harold Shoup No. 3 which were non-mineral in character, and are not before us on appeal.

The United States appealed the ruling to the Interior Board of Land Appeals (hereinafter the Board). The Board reversed the administrative law judge, and held the six claims to be null and void, explicitly overruling *Freeman.* The Board held that in order to satisfy the requirement of discovery of a valuable mineral deposit, it must be shown that the deposit could have been developed, extracted, and marketed at a reasonable profit on February 25, 1920 (the date of the withdrawal of oil shale lands from location), and at all subsequent times without substantial interruption, up to the time of the contest proceedings. The Board adopted Administrative Law Judge Dalby's factual findings that despite considerable investment over the years in vari-

---

1. Other oil shale cases have recently been before this Court. *United States v. Eaton Oil Co.,* C–4139 (Complaint filed July 11, 1972); *U. S.*

*Mobil Oil & Equity Oil Co.,* C–4135 (Settled Nov. 1, 1976); *Amerada Hess Corp. v. Morton,* C–4361 (Complaint filed September 26, 1972).

ous techniques of extracting oil from oil shale, no prudent person was justified in believing the deposits could be presently developed, extracted and marketed at a reasonable profit.

The Board held that the claims here in issue had been filed not on the basis of their then current value—oil shale could not then be developed—but in anticipation that the oil shale would someday become a valuable mineral. The 1872 Mining Act had opened further land to exploration and purchase of "valuable mineral deposits". The overall effect of the Board's ruling was to invalidate 50,000 old mining claims. The Board's ruling expressly invalidated only six claims filed before 1920, but its precedent endangers all other pre-1920 oil shale claims covering at least 500,000 acres of Federal land in Colorado, Utah and Wyoming. One news article commented on the ruling in these words:

> But the board's ruling, unless appealed and reversed in court, would mean that no pre-1920 oil shale claim can be patented and these old claims would be open to department action invalidating them.

"Board Ruling Imperils Oil-Shale Claims," *Denver Post* (July 2, 1974).

The claimants seek review of the decision of the Department of Interior declaring their oil shale claims invalid. They contend that (1) the rule of discovery set out in *Freeman* is a proper application of the traditional and long-established requirements of the mining laws; (2) this rule has received Congressional review and approval; (3) the Interior Department is estopped from applying any other rule to the plaintiffs' claims; and (4) the United States Government has recognized oil shale deposits as valuable mineral deposits under the mining laws. These and other contentions are discussed in Parts III and VI below.

II

■ Final decisions of the Board of Land Appeals within the Department of Interior denying the validity of mining claims are clearly reviewable under the Administrative Procedure Act, 5 U.S.C. § 701

*et seq.; Nickol v. United States*, 501 F.2d 1389 (10th Cir. 1974). The issues raised by the parties in this case are within the scope of review, namely, whether the agency's ruling is supported by law and by substantial evidence. 5 U.S.C. § 706; *Citzens to Preserve Overton Park, Inc., v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Henrikson v. Udall*, 350 F.2d 949, 950 (9th Cir. 1965), *cert. denied*, 384 U.S. 940, 86 S.Ct. 1457, 16 L.Ed.2d 538 (1966).

III

■ Mining laws require the discovery of a valuable mineral deposit prior to the location of a valid claim. 30 U.S.C. §§ 22, 23, 25 and 29; *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); *Cameron v. United States*, 252 U.S. 450, 40 S.Ct. 410, 64 L.Ed. 659 (1920). The traditional definition of discovery is embodied in *Castle v. Womble*, 19 L.D. 455, 457 (1894);

> In this case the presence of mineral is not based upon probabilities, belief and speculation alone, but upon fact, which . . . show that with further work a paying and valuable mine, so far as human foresight can determine, will be developed.

> After a careful consideration of the subject, it is my opinion that where minerals have been found and the evidence is of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine, the requirements of the statute have been met.

This definition has been consistently affirmed. *United States v. Coleman*, 390 U.S. 599, 88 S.Ct. 1327, 20 L.Ed.2d 170 (1968); *Best, supra; Cameron, supra; Chrisman v. Miller*, 197 U.S. 313, 25 S.Ct. 468, 49 L.Ed. 770 (1905).

The "prudent-person test" in *Castle v. Womble* has been elaborated upon by the

"marketability test," that is, whether the mineral can be removed and extracted at a profit:

> Under the mining law Congress has made public lands available to people for the purpose of mining valuable mineral deposits and not for other purposes. The obvious intent was to reward and encourage the discovery of minerals that are valuable in an economic sense. Minerals which no prudent man will extract because there is no demand for them at a price higher than the costs of extraction and transportation are hardly economically valuable. Thus, profitability is an important consideration in applying the prudent-man test, and the marketability test which the Secretary has used here merely recognizes this fact. (Footnotes omitted)

*United States v. Coleman, supra,* 399 U.S. at 602–603, 88 S.Ct. at 1330. The *Coleman* opinion points out that the prudent-person test and the marketability test are essentially the same; the latter is simply a logical extension of the former.

The parties agree upon this basic definition. Thus, the pivotal issue of the dispute lies in whether it was correctly applied to oil shale in the *Freeman* case. *Freeman* deals with two issues relating to the discovery of oil shale: (1) the extent to which a discovery of an outcropping of oil shale on the surface indicates to a prudent person the existence of a bed of oil shale below the surface substantial enough in size to warrant development; and (2) whether oil shale need be presently disposable at a profit. Since it is conceded by the government that the plaintiffs' claims contain substantial amounts of very rich oil shale, it is only the latter issue in *Freeman* which concerns us now.

*Freeman* held that the claimants did not have to prove that they could presently profit from the development of their oil shale claims:

> While at the present time there has been no considerable production of oil from shales, due to the fact that abundant quantities of oil have been produced more cheaply from wells, *there is no pos-*

*sible doubt of its value and of the fact that it constitutes an enormously valuable resource for future use by the American people.*

> It is not necessary, in order to constitute a valid discovery under the general mining laws sufficient to support an application for patent, that the mineral in its present situation can be immediately disposed of at a profit. (Emphasis added)

*Freeman* at 206. This case appears to extend the doctrine of discovery beyond the traditional limits of the paying and valuable mine test in *Castle v. Womble* and subsequent Supreme Court opinions adopting that principle. Those cases speak in terms of the present expenditure of labor and resources in order to develop a presently profitable mine, rather than the future developmental value of the mineral deposit. *Roberts v. Morton,* 549 F.2d 158 (10th Cir. 1976) re-affirmed the present marketability test for alumina deposits located in oil shale land.

The claimants argue that "the present value of a mineral deposit is usually dominated by the present appraisal of the future," in other words, the estimated future worth of the oil shale should be discounted to current values. Plaintiffs' Opening Brief at 130–131. The administrative law judge in his findings of fact agreed with the claimants and expressly found that the future value of oil shale has a certain economic worth, even a substantial economic worth in present-day terms. The discounted future value of a mineral deposit may well be a significant factor to the prudent person in determining whether he can profitably develop the deposit. However, the discounted future value of a mineral deposit is by itself insufficient to meet the marketability and prudent person tests of *Coleman* and *Castle v. Womble.*

■ For purposes of these pre-1920 oil shale claims, however, *Freeman* does not represent an unwarranted extension of the traditional tests for discovery. Merely speculative claims are not discoveries of valuable mineral deposits under the *Freeman* standard. *Freeman* only extended the

prudent person test to a mineral that the prudent person justifiably believed would *inevitably* become valuable, or would become marketable by the time the oil shale deposits could be sufficiently developed, and not only if the demand for the ultimate product were changed. *Roberts, supra, Coleman,* and *Castle v. Womble* are distinguishable because they did not have to consider the unique position of oil shale. Of most significance to our decision is the fact that because oil shale deposits contain a potential domestic source of energy, the Government itself has acted to create a market and to encourage prudent investors to stake claims in oil shale deposits. Part V, *infra.*

## IV

Claimants contend that *Freeman* is in effect an expression of Congressional intent to establish special rules of discovery for oil shale, and that to overrule it would be an interference with Congress' legislative authority. They point specifically to the legislative history of the Mineral Lands Leasing Act of 1920, an administrative ruling shortly thereafter, a general executive and congressional review of oil shale claims in 1930–31, and the enactment in 1956 of an amendment to the mining laws relating to the patenting of oil shale claims. This argument raises two issues: whether Congress did in fact approve the rule of discovery in *Freeman* and, if so, whether the nature and form of the approval warrants giving it such force that only Congress itself can repeal or overrule it.

The legislative history of the Mineral Lands Leasing Act of February 25, 1920 is unclear concerning the Congressional policy for the requirements of discovery of oil shale. As early as 1916, the Department of Interior proposed the withdrawal of oil shale lands from entry, location, and patenting under the Act of May 10, 1872, 30 U.S.C. § 22 *et seq.,* and the placement of the lands under a leasing program. *Hearings on H.R. 406 Before the Senate Committee on Public Lands,* 64th Cong., 1st Sess., at 301, 320–321 (1916). The motiva-

tion for this and subsequent proposals was Congressional perception of the significant value of oil shale as an important source of petroleum to replace other rapidly dwindling supplies. The general view of witnesses and Congressmen was that development of oil shale was at that time not commercially feasible but would be in the near future. *Hearings on H.R. 406, supra; Hearings on S. 45 Before The Senate Committee On Public Lands,* 65th Cong., 1st Sess., pt. 4, at 250–253 (1917); *Hearings on H.R. 3232 and S. 2812 Before the House Committee on Public Lands,* 65th Cong., 2nd Sess., at 811 *et seq.* (1918); 56th *Cong. Rec.* 6984–6987 (1918).

Although the Mineral Lands Leasing Act of 1920 indicated a sharp change in the government's policy of disposing of its material resources, § 37 of that act, now 30 U.S.C. § 193, preserved existing, valid claims to oil shale. Few comments were made concerning this section, and even fewer were directed to the requirements of a valid discovery of oil shale. The remarks of Congressman Taylor of Colorado, one of the managers of the bill in the House, are typical:

Yet the Senate and the House have both always retained in every bill of this kind the provisions of section 37 and expressly recognized and legalized and attempted to affirmatively protect the property and legal rights under the laws as they are now and have for over 40 years been on our statute books of the honest prospectors, the bona fide locators in good faith, and holders of rightful claims, claims that are valid and existing under existing laws at the date of the passage of this act. Those claimants, even though they may not have perfected a legal discovery under the laws are entitled to go ahead and maintain and perfect their claims under the present existing laws and obtain a patent to their lands just as though this bill had never been passed, and I hope no court or Federal department will ever attempt to deny to these people the rights which Congress looks upon as vested and is attempting in section 37 to guarantee to them.

59 *Cong.Rec.* 2711–2712 (1920). See also 59 *Cong.Rec.* 2709 (1920); 58 *Cong.Rec.* 4444 (1919); 58 *Cong.Rec.* 4579–4584 (1919).

The rule of discovery at that time was the prudent person test of *Castle v. Womble.* That would indicate that oil shale was subject to the same rigorous standards of profitability and commercial development as all other locatable minerals. However, as the extensive hearings make clear, Congress was fully aware that commercial development of oil shale was not yet technologically feasible. Despite this knowledge, expressions in Congress were all in the direction and belief that oil shale lands were of tremendous value and, as Congressman Taylor's remarks indicate, that valid oil shale claims did exist.

On May 10, 1920, shortly after the passage of the Mineral Lands Leasing Act, the Department of Interior issued *Instructions* relating to oil shale placer claims. 47 L.D. 548 (hereinafter *Instructions* ). These *Instructions* were in response to the first application for patent of 14 oil shale placer mining claims under the 1920 Act. The purpose was to provide guidelines as to what constituted a discovery of oil shale under the new law. The *Instructions* held that consistent with the Department's prior position, oil shale was a valuable and, therefore, locatable mineral:

> The Department has had numerous inquiries as to the locatability and patentability of such deposits under the mining laws and in response thereto, while disclaiming any intention to expressing a binding opinion in the premises, it has nevertheless declared itself as favorable to the view that such deposits, if valuable, are subject to location and purchase under the mining laws . . .

Oil shale having been thus recognized by the Department and by Congress as a mineral deposit and a source of petroleum, and having been demonstrated elsewhere to be a material of economic importance, lands valuable on account thereof must be held to have been subject to valid location and appropriation under the placer mining laws, to the same extent and subject to the same provisions and conditions as if valuable on account of oil or gas.

*Id.* at 549–551. The *Instructions,* therefore, determined that oil shale was sufficiently valuable to be discoverable. Only questions such as the size and richness of the deposits would appear to remain. That this is the correct interpretation of the *Instructions* is indicated by the fact that the 14 claims which occasioned the *Instructions* were granted patents.

The next Congressional action came in 1930–31, subsequent to the *Freeman* decision which reaffirmed the principle of the 1920 *Instructions* that oil shale was valuable for discovery purposes even though not presently profitable. The immediate cause of the Congressional review was the accusation by Ralph S. Kelly, Chief of the Field Division of the Department of Interior in Denver before his resignation in 1930, that the mining laws were being improperly administered with respect to oil shale. Among other things, he pointed to what he felt was a clearly erroneous decision in the *Freeman* case. 74 *Cong.Rec.* 7080–7083 (1931); *Hearings on S.Res. 379 Before the Senate Committee on Public Lands and Surveys,* 71st Cong. 3rd Sess. (1931); *Consolidated Hearings on H.R. 3754, H.R. 12802, H.R. 13191, H.R. 15002, H.R. 15130, H.R. 15131, and H.R. 15132 Before the House Committee on Public Lands,* 71st Cong., 2nd and 3rd Sess. (1931).

The discovery rule of *Freeman* was thoroughly explored by Congress. It was clearly understood that although commercial development of oil shale was not yet feasible, claimants were nevertheless receiving patents under *Freeman* based on oil shale's future value as a source of petroleum. *Hearings on S.Res. 379, supra* at 22–27. The hearings revealed that the *Instructions* and *Freeman* had already resulted in the patenting of 184,000 acres of oil shale lands, and that an additional 85,000 acres could be disposed of through pending patent applications. *Consolidated Hearings on H.R. 3754,*

*supra* at 181; *H.R.Rep.No.2537,* 71st Cong., 3rd Sess., 4, 9 (1931); 74 *Cong.Rec.* 4100–4101, 4104 (1931).

Despite this thorough knowledge of the legal aspects and practical consequences of the *Freeman* doctrine, the oil shale legislation reported to the House did not modify the *Freeman* rule of discovery. *H.R.Rep. No.2537, supra;* 74 *Cong.Rec.* 4102–4104 (1931). Furthermore, the Chairman of the Senate Committee on Public Lands, Senator Gerald P. Nye, wrote to Secretary of Interior Wilbur that patenting should continue. Exhibit C–699 in the Administrative Record. The failure of Congress even to propose legislation that would alter the requirements of discovery under *Freeman* manifests its approval of that rule.

The most recent significant Congressional action affecting the patenting of oil shale claims was the passage of the Act of July 20, 1956, 70 Stat. 592, 30 U.S.C. § 122. This Act facilitates the patenting of oil shale claims preserved under 30 U.S.C. § 193 by eliminating the requirement that the applicant must also obtain any outstanding patent to the surface rights. However, Congress did not specifically address the problem of discovery at all.

■ In summary, a review of the legislative history and subsequent administrative and Congressional action under the Mineral Lands Leasing Act of 1920 indicates that Congress intended and did, in fact, ratify a liberalized version of the traditional rule of discovery, as embodied in *Freeman.* Although it is difficult to discern the Congressional intent from the debates preceding the enactment of the Mineral Lands Leasing Act of 1920, the 1920 *Instructions,* promulgated only three months later, disclose that oil shale was regarded as sufficiently valuable to be a legally discoverable mineral despite the lack of prospects for immediate profitable development. This administrative ruling should be accorded considerable weight (especially in view of the otherwise ambiguous Congressional intent), since it is a contemporaneous construction by those who are presumably intimately famil-iar with the legislative history and who are charged with the enforcement of the act. *United States v. Leslie Salt Co.,* 350 U.S. 383, 396, 76 S.Ct. 416, 100 L.Ed. 441 (1956); *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1933); *United States v. Shreveport Grain and Elevator Co.,* 287 U.S. 77, 84, 53 S.Ct. 42, 77 L.Ed. 175 (1932); *United States v. Philbrick,* 120 U.S. 52, 59, 7 S.Ct. 413, 30 L.Ed. 559 (1887); *Brennan v. Udall,* 379 F.2d 803, 806–807 (10th Cir. 1967), *cert. denied,* 389 U.S. 975, 88 S.Ct. 477, 19 L.Ed.2d 468.

As noted, in 1930–1931, a major investigation was conducted by Congress into the Department of Interior's patenting of oil shale lands, including an evaluation of the discovery rule of *Freeman* and the implications it held for further patenting of oil shale lands. The failure of Congress to modify or overrule the *Freeman* doctrine when presented with an opportunity to do so is a further indication of Congress' intent. *Corn Products Refining Co. v. Commissioner of Internal Revenue,* 350 U.S. 46, 53, 76 S.Ct. 20, 100 L.Ed. 29 (1955); *United States v. Leslie Salt Co., supra* 350 U.S. at 397, 76 S.Ct. 416; *Norwegian Nitrogen Products Co. v. United States, supra* 288 U.S. at 313, 53 S.Ct. 350; *Kay v. FCC,* 143 U.S.App.D.C. 223, 443 F.2d 638, 646–647 (1970). As was contemplated by Congress, the Department of Interior resumed patenting oil shale lands under *Freeman.*

That Congress should take a special attitude toward oil shale lands and ratify in *Freeman* an exception to the traditional discovery rule is explained by the unusual role of oil shale as a natural resource in contrast to other locatable minerals. As the Congressional hearings and debates have disclosed, oil shale was perceived as highly valuable and crucial to the national security and welfare. Congress believed that commercial development of oil shale would soon be feasible, because of its perception of the rapid depletion of existing sources of oil. That attitude has persisted, in varying degrees, to this day. Conse-

quently, various means have been sought to foster the development of oil shale. One such technique was to liberalize the rules of discovery.

■■ This long, stormy, and somewhat complicated Congressional and administrative involvement in the disposal of oil shale lands demonstrates Congressional approval of the *Freeman* rule of discovery. Consequently, the Courts should respect and apply the approved rule, in the absence of Congressional action to the contrary. An attempt by the Board of Land Appeals or this Court to overrule *Freeman* would be violative of Congressional legislative authority, and therefore improper. *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *Fribourg Navigation Co., Inc., v. Commissioner of Internal Revenue,* 383 U.S. 272, 283, 86 S.Ct. 862, 15 L.Ed.2d 751 (1966); *Cammarano v. U. S.,* 358 U.S. 498, 511, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959); *Service v. Dulles,* 354 U.S. 363, 380, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Corn Products Refining Co. v. Commissioner, supra; National Labor Relations Board v. Gullett Gin Co.,* 340 U.S. 361, 365–366, 71 S.Ct. 337, 95 L.Ed. 337 (1951); *Wilmette Park District v. Campbell,* 338 U.S. 411, 417–418, 70 S.Ct. 195, 94 L.Ed. 205 (1949); *Crane v. Commissioner,* 331 U.S. 1, 7–8, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947); *Brooks v. Dewar,* 313 U.S. 354, 360–361, 61 S.Ct. 979, 85 L.Ed. 1399 (1941); *Helvering v. R. J. Reynolds Tobacco Co.,* 306 U.S. 110, 116, 59 S.Ct. 423, 83 L.Ed. 536 (1939); *Brennan v. Udall, supra.* The "re-enactment rule" enunciated in these cases should not be used in the absence of clear evidence that Congress was aware of the administrative regulation at the time of its review of the rules of discovery. *Rothenberg v. U. S.,* 233 F.Supp. 864, 866–867 (D.Kan.1964), *aff'd.,* 350 F.2d 319 (10th Cir. 1965); *see also* Davis, *Administrative Law* § 5.07 (1958). Here, it is clear that Congress refused to modify the *Freeman* rule despite full knowledge of its existence and meaning.

V

■ For years, top administrators in the Interior Department have recognized the energy potential of oil shale. They themselves generated financial and other interest in its mining. Even if the Congressional treatment of the *Freeman* rule is considered merely as an interpretive aid, and not as hardening the *Freeman* rule into an act of law,[2] we hold that the Interior Department is estopped from challenging the validity of the pre-1920 oil shale claims involved in this case. "The doctrine of equitable estoppel binds the Government for the conduct of its agents while they are acting within the scope of their employment." *Atlantic Richfield Co. v. Hickel,* 432 F.2d 587, 591 (10th Cir. 1970). *See United States v. Wharton,* 514 F.2d 406, 412–413 (9th Cir. 1975); *Fox v. Morton,* 505 F.2d 254, 256 (9th Cir. 1974); *C. F. Lytle Co. v. Clark,* 491 F.2d 834, 838 (10th Cir. 1974); *Brandt v. Hickel,* 427 F.2d 53, 56–57 (9th Cir. 1970); *United States v. Georgia-Pacific Co.,* 421 F.2d 92 (9th Cir. 1970); *McKay v. Wahlenmaier,* 96 U.S.App.D.C. 313, 226 F.2d 35, 43 (1955); *Chapman v. El Paso Nat. Gas Co.,* 92 U.S. App.D.C. 154, 204 F.2d 46, 53–54 (1953); Davis, *Administrative Law of the Seventies,* § 17.01 (1976); Comment, "Emergence of an Equitable Doctrine of Estoppel Against the Government—The Oil Shale Cases," 46 Colo.L.Rev. 433 (1975); Berger, Estoppel Against the Government, 21 U.Chi.L.Rev. 680 (1954). Prudent investors detrimentally relied upon the deliberate actions and statements of high government authorities. Such government encouragement was clearly undertaken in an official capacity, and comports with the subsequent treatment of oil shale both by the Department of the Interior in its *Instructions* of 1920 and by Congress. This is a clear case for the application of equitable estoppel against the government.

A review of public announcements and events through the years will set the proper factual perspective for oil shale development and its potential in 1920. "Interest in the commercial development of oil shale has

**2.** *See* Davis, *supra* at § 5.07.

varied directly with the need for hydrocarbon fuels and inversely with . . . the availability of shale oil's chief competitor—conventional crude oil." Thomas A. Sladek, "Recent Trends in Oil Shale—Part 1: History, Nature, and Reserves," 17 *Mineral Industries Bulletin* 1, 3 (Nov. 1974). Until shortly after the discovery of oil at Titusville in 1859, the "U.S. shale oil industry . . . was a vital part of the American economy." *Id.*

For half a century thereafter, the oil shale industry lay dormant. At the beginning of the twentieth century, oil shale was regarded even by the speculator only as an indication of the existence of a nearby oil field:

> The tunnel stopped in shale, which is certainly what is known as oil shale, but nobody imagined that it contained oil . . . No tests have yet been made of the oil, but it is probable that a sample will be sent to some expert, and possibly the oil may be developed and piped down to the city before another year has passed.

"Oil Oozing from Breast of Cowenhoven Tunnel," *The Denver Times* at 11 (February 7, 1902).[3]

> "an expert operator . . . says he has never seen better indications for the development of a first class field, the shale encountered even in croppings is so thoroughly impregnated with oil that it burns readily and the indications of gas are to be found everywhere."

"Oil in Rio Blanco," *Id.* at 6 (May 21, 1907). *See also,* "Irrigation Project," *Id.* at 6 (May 23, 1902); "Oil Excitement in Slate Creek District," *Id.* at 9 (Feb. 23, 1903).

However, during World War I, officials of the Federal government actively encouraged Westerners to invest in Colorado's oil shale deposits: "I plead with you, men and women of the West . . . Develop your vast resources on a sound business basis . . . Let every investor get a run for his money." Speech by Dr. David T. Day, Chief of the United States Division of Petroleum Research, United States Bureau of Mines, delivered to delegates from Colorado mining associations and the public in the chamber of the Colorado House of Representatives, "Colorado's Oil Shales to Save World—Day," *Id.* at 2 (Jan. 24, 1918). "The future of the oil industry is in the hands of the people of Colorado and Utah . . . If the people of those states do not take hold and develop their resources, Eastern people will come in and reap the benefits." Speech by Day to the Colorado Civic Association "Expert Tells of Shale Riches," *Id.* (June 26, 1918).

Both Dr. Day and Interior Secretary Lane emphasized the fact that Colorado's oil shale deposits would "save the world" when the oil fields were exhausted:

> It is but a question of years—and not many of them, at that—until the oil fields of the world will be exhausted to the point where gasoline and other products of crude oil must be secured from another source and—the rich oil shales of Colorado will be that source.

"Save the World," *supra.*

Investment in oil shale, which had been scorned by prudent persons at the turn of the century, gained the interest of the financial world:

> The financial world began to regard him [an early forecaster who preached that oil shale would save the world] as anything but 'cracked' on the subject . . . until today [when] people are giving serious attention to those treasure vaults that the world up to only yesterday said contained only debris instead of untold wealth.

"Colorado's Oil Shales to Save World," *supra.*

---

**3.** Local newspapers are an invaluable source for determining whether the "prudent person" prior to February 25, 1920 thought that an investment in oil shale deposits was mere speculation or was presently capable of being developed at a reasonable profit. The impact upon the beliefs of prudent persons can be determined from informative statements in newspaper articles. We do not consider them for the truth of the facts therein asserted, but only for their impact on the prudent mining investor. Rules 201 and 902(6), Fed.R.Evid. permit us to take notice of statements in newspaper articles without the necessity of authentication.

The following announcement by Secretary Lane of the Department of the Interior helped trigger the filing of thousands of claims prior to 1920:

The most important single act during the month of December in connection with the classification of mineral lands was the creation of two Naval oil shale reserves, one of 45,440 acres in western Colorado, and one of 86,584 acres in northeastern Utah. The lands thus set apart for the use of the Navy contain bodies of shale which, when mined and distilled in properly constructed retorts, yield oil of good quality. Thus far oil has not been extracted from shale in the United States in commercial quantities since the discovery of crude oil developed by wells, because oil can be secured in the latter way much more cheaply than thru the more complex process of extracting it from shales. But the oil shale industry has existed in Scotland for half a century in spite of the competition of the oil fields of the world, and the time will doubtless come when the large oil shale deposits of western United States will also be developed in a commercial way.

The Naval oil shale preserves have been created to provide for the needs of the Navy during that future time when the ordinary oil fields have been so reduced that it becomes practicable and profitable to distill the more expensive oil shale.

"Colorado Shale Reservations Are Held Important." *The Denver Post* at 1 (Jan. 21, 1917). In fact, the Federal government informed Colorado's interested citizenry that its oil shale could be mined at a substantial profit, and by a simple process:

Based on figures from the Scotch and French shale operations, shale in Colorado and her sister states can be mined on a large scale and give the investor better than 50 percent profit. Shale to be mined at a profit should be in veins not less than three feet thick.

"Colorado's Oil Shales to Save World," *supra*.

Fancy processes are not needed. Just tear a leaf out of the Scotch book. They have been making profits out of shales since 1869, and their methods are good. The industry requires manufacturers and miners. This oil shale is very tough and not easy to mine, but Colorado people are past masters of mining and will solve all such problems . . . Dr. Day stated the government thought enough of the shale deposits to create a reserve of 145,000 acres in Colorado and Utah for the future use of the Navy, but that this reserve did not by any means include the richest shales, and there is enough left unreserved for all.

"Expert Tells of Shale Riches," *supra*.

Geologists reinforced the view of Federal officials that the oil shale deposits ought to be mined, and could be mined at a reasonable net profit. *See* "Possibilities of State's Shales Outlined By Professor George," *The Rocky Mountain News* at sec. one (Jan. 1, 1918); "Natural Oil Running Short, But State Shale Will Produce For 800 Years," *The Denver Times* at 8 (Jan. 1, 1920).

 Thus, the Government stressed the fact that oil shale deposits would *inevitably* become commercially marketable. This inevitability removed the pre-1920 claims in existing oil shale deposits from the realm of mere speculation, and gave them sufficient present value to constitute a valuable mineral deposit pursuant to 30 U.S.C. § 22 *et seq.* While we agree with the Board that speculative future value is not a sufficient showing of present value to make oil shale a "valuable mineral," certain (or apparently certain) value in the near future is sufficient evidence of present value. In the Government's encouragement of early investment in oil shale, there was no suggestion that "dramatic technological breakthroughs" or unexpected "market changes" would be necessary in order to develop the oil shale deposits and make them profitable. The Board also stated that "in the 102 years since enactment of the general mining law, value has always been determined upon present facts, not upon possibilities of the future." *Winegar*, 16 IBLA at 168. This is incorrect in that the value of *oil shale* deposits has always

been determined in accordance with its future potential.

Among those early prudent investors was Karl C. Schuyler, Sr., an authority on mining law, who became a United States Senator from Colorado in 1932. His partners included George A. Taff, an engineer who had been instrumental in the construction of the Pike's Peak hydroelectric plants, and Eugene D. Milliken, United States Senator from Colorado from 1941 to 1957. Reports made by mineral examiners of the General Land Office concluded that:

> Whether or not the lessee is successful in his attempt to solve the shale question, there is no question but that the attempt that he is making is made on a basis sufficiently large and is done under the direction of sufficiently competent technical men to insure the belief that the men who are financing the attempt have every confidence in its success.
>
> Mention is made of these last facts to make clear the fact that in our opinion, the entire system of development work on which the applicant relies for patent, when viewed in connection with the present operations of the lessee, establishes beyond any doubt the bona fides of the work.

General Land Office Field Examiners, *Mineral Report* at p. 16 (Nov. 9, 1920). The fact that these early prudent investors were persons of prudence and mining experience who reasonably believed that a valuable mine could be developed is persuasive authority to satisfy the "valuable mineral" test, even under *Castle v. Womble, supra,* and *United States v. Coleman, supra.*

The excitement of thousands of investors who staked claims in oil shale deposits prior to passage of the Mineral Leasing Act of 1920 was fueled by a combination of factors:

> the supply of crude oil from domestic fields fell below demand, and increasing amounts of crude were imported from the new fields in Mexico. The U. S. Geological survey [sic] estimated that a nine-year supply of domestic natural petroleum remained in the United States. No addi-

tional discoveries were anticipated, and it appeared that the automobile, which was already a major element in American life, would soon fall idle for lack of fuel. At about the same time, the USGS announced that fantastic quantities of potential fuels were contained in the western oil shales. When combined with the predictions of a coming fuel shortage, this announcement produced an oil shale boon.

Sladek, *supra* at 3.

Interest in oil shale was dampened in the 1920's as a result of (a) lack of technology, because the industry had stagnated for a half-century, (b) widespread promotional fraud, which weakened public confidence in the industry, and (c) the discovery of abundant oil reserves in Texas, which was the single most significant factor that diminished interest in oil shale. *Id.*

During World War II, the United States became more dependent on imported oil. In response to this need, Congress passed the Synthetic Fuels Act of 1944 "which acknowledged the importance of a reliable domestic supply of fuels and which provided the Bureau of Mines with a charter to establish such a supply from the domestic oil shale deposits. The Bureau began a research program that has continued to the present day." *Id.*

Once again, the discovery of oil in the Middle East, on the continental shelf of the United States, and in Alaska, crushed public interest in oil shale until the "energy crisis" of 1973. *Id.*

In the aftermath of the fuel embargo, public interest in oil shale and in other energy alternatives has remained high. Even today, when the Alaskan pipeline is nearly completed, reports on oil shale and synthetic fuels are given significant treatment by the press. *See, e. g.,* "Oil-Shale Funds Blocked," *The Denver Post* 1 (Sept. 23, 1976); "Interior Predicts Competitive Shale," *The Rocky Mountain News* 27 (Sept. 13, 1976); "Colorado: Tomorrow, the West," *The Denver Post* (Sept. 5, 1976); "Is Oil Shale Dead?," *The Straight Creek Journal* 6 (Sept. 2, 1976); "Kleppe 'Stumped' On

Oil Shale," *The Denver Post* (Aug. 30, 1976); "Oil-Shale Loan Plan Back," *Id.* (Aug. 29, 1976); "Dead Oil Shale Project Revived," *Id.* at p. 1 (Dec. 1, 1976).

In November 1974, the Federal Energy Administration published its Final Task Force Report, *Project Independence: Potential Future Role of Oil Shale: Prospects and Constraints.* The FEA noted that estimates of oil shale resources have greatly increased since the 1920's, and that Colorado has 84% of the higher grade reserves, which are among the finest and most easily mined in the world. *Id.* at 1. The Federal government owns 80% of the known resources, although there were thousands of claims filed on this public land prior to 1920, "when oil shale was a locatable mineral under the mining laws." *Id.* at 96. The Report urges that the Government lease or sell its land to private industry at a fair market value and in a manner that would achieve efficient resource allocation by approximating a perfectly competitive market. Because the Government has refused to lease or sell its land, which contains the most valuable oil shale resources, private enterprises are unwilling to develop their privately held deposits. *Id.* at 101–102:

a private developer will continue to be reluctant to develop private lands first so long as the possibility exists that at some future date, as a result of leasing public lands, the high grade resources would be available to potential competitors as well as whatever information the pioneering company had already developed. The situation has been assessed by the National Petroleum Council which has concluded that without the availability of public lands, development may be limited to one or possibly two plants with a combined production of 100,000 barrels per day by 1985, even though the potential is probably closer to 400,000 daily barrels. *Id.* at 102.

Even the upwardly revised cost estimates of shale oil production ($12 to $18 per barrel) indicate that shale oil could be presently competitive with oil imported from OPEC, especially if world oil prices rise.

Report of the Department of the Interior, *Mining and Minerals Policy* 72 (July 1976). This report notes that the time required to determine the validity of claims filed on public lands when oil shale was a locatable mineral may impede commercial development. *Id.* at 73. *See Project Independence, supra* at 39. The Secretary of the Interior urged that a synthetic fuel commercialization bill be passed by Congress in 1976, in order to "encourage the development of the industry and provide an incentive for accelerated leasing and production of shale oil," *Id.*

At about the same time, the GAO released a report to Congress entitled, *An Evaluation of Proposed Federal Assistance for Financing Commercialization of Emerging Energy Technologies* (Aug. 1976), wherein it recommended that the synthetic fuel commercialization bill not be passed:

Synthetic fuels production—while technically feasible with first generation technologies—is not cost effective in that the total cost of output is not price competitive with foreign oil. Nor does it look as attractive when compared to other technologies, which we examined, on an incremental price basis. We believe synthetic fuels technologies would receive a high priority for Government research, development and demonstration efforts designed to develop more advanced and efficient production technologies, but we question whether assistance should be given to commercialization of synthetic fuels at the present time.

*Id.* at 48.

Faced with these polarized positions, on September 23, 1976, the House of Representatives defeated a proposed $4 billion loan guarantee as an incentive to produce synthetic fuel by a one-vote margin. Multiple economic, aesthetic, environmental, engineering, and political uncertainties throughout the field of energy resource development have led to this intense divisiveness within the federal government itself. Yet, the nation requires a stable, long-term policy regarding the development of oil shale deposits. Such a coherent energy re-

source policy is especially important today, when we have become much more reliant than before the "energy crisis" of 1973 upon foreign oil, when the future of nuclear energy remains unclear, and when other energy alternatives are technologically and economically more unrealistic than oil shale.

Reliance on imported energy requires acceptance of a worsening of the balance of payments. In addition to the bleak monetary picture, a certain insecurity is inevitable when the operation of the nation depends to a large extent on a steady supply of fuel from an area of the world which has been in an almost continuous state of war for over 25 years.

In the long run, the United States and its neighbors will need many other sources of energy besides petroleum, and oil from the abundant reserves of oil shale will probably be one of the alternative sources. There is certainly much current interest and involvement in the oil shale business. However, at the present time oil shale is at the mercy of many political and economic elements, and it is uncertain that the current efforts will be of sufficient duration to produce a mature shale oil industry.

Sladek, *supra*, at 3–4; *See* Hon. Wayne N. Aspinall "Oil Shale Development Handicapped by Government Indecision," 59 Quarterly of the Colorado School of Mines 91 (July 1964).

Because of the instability of the Government's energy policy, it has appeared prudent, at times, to invest in oil shale, while at other times, such investment has appeared merely speculative. While the courts cannot prevent the Government from having an unstable energy policy, the courts must prevent the Government from altering legal standards that have been relied upon by investors for the past half-century.

Since World War I, prudent mining investors and industrial giants have purchased oil shale land in the reasonable expectation that future profits would justify such purchases. *See Winegar, supra* at 134–138. The Standard Oil Company of California began to purchase Colorado land bearing oil shale in 1943 "for their oil shale resources," which Standard considered valuable. (Deposition of W. S. Svenson at 28). Since 1927, Texaco has acquired nearly 30,000 acres of oil shale land in Colorado and Utah in the belief that such an acquisition has been prudent. (Deposition of C. E. Moser at 47). Since 1955, Mobil Oil Co. has acquired about 20,000 acres of oil shale land, and holds an option to purchase about 12,000 other acres "in the expectation of eventually returning a profit justifying the purchase" (deposition of T. W. Nelson at 40). Since 1952, Cities Service has acquired about 10,000 acres of Colorado oil shale land, and considers that investment to have been prudent (deposition of D. M. Anthony at 30–32). Since 1961, TOSCO has acquired about 30,000 acres of oil shale land in Colorado and Utah, and regards this as a prudent investment; "a viable industry cannot exist without the ownership of these reserves" (testimony of H. Koolsbergen, Tr. 5033).

Apart from the fact that the Board's reversal of the *Freeman* standard has ignored a century of reliance on the prudent man standard as it applies to the peculiar situation of oil shale, such action could jeopardize the future of our nation. It is apparent that world crude oil prices can only continue to rise. With constantly depleting oil reserves, there must come a time when the recovery of oil from shale will be competitive with crude oil. At this critical juncture, the future of oil shale investment ought not to be tied up in decades of litigation. As with every other industry, the technology would improve during competitive private development. Prudent investors might be those who recognize that we cannot wait until the next severe shortage of crude oil (which may be the final shortage). In our view, *United States v. Coleman, supra*, did not superimpose the requirement that shale oil be presently competitive with crude oil. Prudent investors can foresee a time in the not-too-distant future when it will be cheaper to supply more of this country's energy needs with the vastly greater amount of shale oil.

## VI

The Tenth Circuit and this Court have recently considered the applicability of the "prudent man" test in the area of mining claims. *United States v. Zweifel*, 508 F.2d 1150, 1157 (10th Cir. 1975); *Hallenbeck v. Kleppe*, No. 75–786 (D.Colo., Aug. 31, 1976).

> The government must go forward with sufficient evidence to establish prima facie the invalidity of contested claims, and the burden then shifts to the claimant to show by a preponderance of the evidence that his claim is valid.

*Zweifel, supra* at 1157; *Hallenbeck, supra* at 7.

 In view of the Federal Government's own statements which encouraged prudent investors to stake claims in oil shale deposits, we find that the Government has not established a prima facie case of invalidity. We do not hold that an administrative agency cannot overrule its own long-standing precedents. However, because of subsequent Congressional approval, the *Freeman* standard can only be overruled by legislative action. Even if we were to hold that the Board itself could overrule *Freeman*, and that it could determine that oil shale can no longer be regarded as a valuable mineral under the prudent investor test, the Government cannot assert that the very oil shale claims it had encouraged are not valid. The reversal of the original intention of the Interior Department and of Congress requires application of estoppel against the Government. *See Vassiliou v. District Director of Immigration & Nat. Serv.*, 461 F.2d 1193, 1195 (10th Cir. 1972). Moreover, where an established rule has long been relied upon by investors, an administrative agency should not reverse its position on a retroactive basis. *See NLRB v. Majestic Weaving Co.*, 355 F.2d 854, 859–861 (2d Cir. 1966) (Judge Friendly). We hold that the six pre-1920 oil shale claims were discoveries of valuable mineral deposits and are valid claims.

## VII

Accordingly, IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment is GRANTED. Defendant's Motion for Summary Judgment is DENIED.

IT IS FURTHER ORDERED that by February 1, 1977, Plaintiffs are to submit an Order and Form of Judgment setting forth their claims with particularity and description and implementing the Court's ruling herein.