**TEXAS OIL & GAS CORP., Plaintiff,**

**v.**

**Cecil ANDRUS, Defendant.**

**Civ. A. No. 79–2976.**

United States District Court, District of Columbia.

Sept. 25, 1980.

As Amended Sept. 26, 1980.

Jason R. Warran, James W. McDade, Washington, D. C., Bradley D. Jesson, Ft. Smith, Ark., Craig R. Carver, Denver, Colo., for plaintiff.

Andrew F. Walch, Lands Div., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Presented by the parties' pending cross–motions for summary judgment are the questions of the validity of the November 1, 1979, action of defendant Cecil D. Andrus, Secretary of the United States Department of the Interior, in canceling certain oil and gas leases issued on a noncompetitive basis to plaintiff Texas Oil & Gas Corporation for lands located on the military reservation of Fort Chaffee, Arkansas, and, if such cancellation were improper, the validity of the Secretary's September 20, 1979, decree that delayed indefinitely the issuance to plaintiff of the permits required to begin drilling for oil and gas on the land at Fort Chaffee. Only the former issue need be addressed, however, since a thorough review of the record in this action not only reveals that there are no material facts at issue, but also compels the conclusion that the Secretary's action invalidating the leases was not improper. Accordingly, defendant's motion for summary judgment will be granted and judgment entered in his favor and against the plaintiff.

Because of their importance in the resolution of the issues presented, initial explanation of the statutory and regulatory schemes under which oil and gas leases are issued is required.

The lease agreements in question in this litigation involved approximately 40,000 acres of federal property classified as "acquired" lands, that is, lands which are acquired by the United States through purchase or other transfer from a state or private individual, usually for dedication to a particular use. In contrast to such acquired lands are "public domain" lands, which are owned by the United States by virtue of its sovereignty. The distinction between these types of federal real estate is important in that, as a matter of historical perspective, it was the basis for the evolution of the present statutory scheme through which the Congress has delegated responsibility to the Secretary of the Interior for the leasing of federal lands for mineral development.

The authority of the Secretary to administer the grants of mineral rights on public domain lands has been recognized by Congress since the middle of the last century, *see, e. g.,* Act of July 26, 1866, ch. 262, 14 Stat. 251 (currently codified as amended at scattered sections of 30, 43 U.S.C.); Act of May 10, 1872, ch. 152, 17 Stat. 91 (currently codified as amended at 30 U.S.C. § 21 *et seq.*), although it was not until 1920 that Congress began to authorize the present system of leasing such lands for oil and gas exploration and production by the Secretary, Mineral Leasing Act of 1920, Pub.L. No.146, ch. 85, 41 Stat. 437 (1920) (currently codified as amended at 30 U.S.C. § 181 *et seq.*). Acquired lands had been leased on an *ad hoc* basis for some time, but it was not until 1947 that legislation was passed specifically giving the Secretary authority to lease such property. Mineral Leasing Act for Acquired Lands, Pub.L. No. 382, ch. 513, 61 Stat. 913 (currently codified as amended at 30 U.S.C. § 351 *et seq.*).

Of the provisions of that enactment providing for the leasing of acquired lands, most pertinent to this case is its language, found in section 352 of title 30 of the United States Code, denoting which acquired lands are subject to lease. As originally passed, it provided:

[A]ll deposits of ... oil [and] gas ... which are owned or may hereafter be acquired by the United States and which are within the lands acquired by the United States (exclusive of such deposits in such acquired lands as are (a) situated within incorporated cities, towns and villages, national parks and monuments, (b) *set apart for military or naval purposes,* or (c) tidelands or submerged lands) may be leased by the Secretary [of the Interior] under the same conditions as contained in the leasing provisions of the mineral leasing laws, subject to the provisions hereof. ... No mineral deposit covered by this section shall be leased except with consent of the head of the executive department ... having jurisdiction over the lands containing such deposit ....

30 U.S.C. § 352 (1970) (emphasis supplied). This congressional mandate that acquired lands set aside for military purposes be excluded from those acquired properties that could be leased was continued until 1976 when section 352 was amended to delete that exemption. Federal Coal Leasing Amendments Act of 1975, Pub.L. No. 94–377, § 12, 90 Stat. 1090 (1976), *codified at* 30 U.S.C. § 352 (1976). That amendment precipitated the circumstances that have culminated in this litigation.

On May 9, 1977, some nine months after the effective date of the amendment to section 352, plaintiff Texas Oil & Gas filed applications for thirty–eight noncompetitive oil and gas leases on an area of 78,962.-73 acres within the boundaries of Fort Chaffee, Arkansas.[1] These offers were the

---

1. Leases are to be issued only after competitive bidding for those lands located on a known geological structure of a producing oil and gas field while those lease applications for lands not on such a known structure can simply be granted to the first qualified bidder at his offered price. 30 U.S.C. §§ 226(b)–(c), 352 (1976). Although the validity of the United

first noncompetitive applications to lease these federal acquired lands set aside for military purposes following the 1976 amendment.

Not long after the congressional change in section 352 in 1976, action was taken by the Department of Defense and the Department of the Interior, the agencies most directly involved, to amend their applicable regulations. A little over one month after the lease applications were filed by Texas Oil & Gas, the Corps of Engineers, despite the recent revision of section 352 enacted in the Federal Coal Leasing Amendments Act, published proposed regulations that would have continued its past prohibition on leasing acquired lands set aside for military purposes for oil and gas exploration and production. 42 Fed.Reg. 31036 (1977). On September 16, 1977, the Department of the Interior responded to the amendment to section 352 by publishing a proposed change in its regulation concerning acquired lands, 43 C.F.R. § 3101.2–1. As it was in effect at the time of the passage of the Federal Coal Leasing Amendments Act, that regulation declared in pertinent part:

§ 3101.2–1 [Acquired] Lands to which the Act does not apply.

\* \* \* \* \* \*

(f) Set apart for military or naval purposes, including lands within naval petroleum and oil shale reserves . . . .

43 C.F.R. § 3101.2–1(f) (1977). The regulation proposed by the Department of the Interior was to amend subsection (f) to modify its reference to all acquired lands set aside for military purposes so as to include only those "[w]ithin naval petroleum and oil shale reserves and within the National Petroleum Reserve in Alaska." 42 Fed.Reg. 46558 (1977). It was also stated in the *Federal Register* notice accompanying the proposed rule change:

The regulatory prohibition reflecting the old statutory provision remains in effect, serving as an exercise of the Secretary's

new authority to lease or not to lease such deposits. This proposal would remove the regulatory prohibition and open these lands for mineral leasing under the same terms and conditions as apply to other acquired lands . . . .

*Id.*

Comments on their proposed regulations were requested and received by both the Corps of Engineers and the Department of the Interior, which included comments by plaintiff concerning the proposed change in section 3101.2–1. On July 10, 1978, the final rules of the Corps of Engineers and the Department of Defense were published in which it was indicated that the Corps of Engineers was willing to consider leasing of acquired military lands so long as it did not impair "the adequate utilization of the lands for the primary purposes for which they have been acquired or are being administered." 43 Fed.Reg. 29752 (1978), *codified at* 32 C.F.R. § 643.35(a)(1) (1980). As to the Interior Department's proposed change in 43 C.F.R. § 3101.2–1, a final rule adopting the amendment to subsection (f) was published on August 22, 1978, to be effective September 21, 1978. 43 Fed.Reg. 37202 (1978). In the department's comments on the rule, it was indicated that together the Department of Defense and the Department of the Interior would "determine the suitability of the land for mineral leasing and development on a case by case or area by area basis before the Secretary of the Interior issues a lease." *Id.*

With regard to the validity of the plaintiff's lease applications, because they were filed before the effective date of the Interior Department's regulation concerning leasing of acquired lands used for military purposes, some uncertainty existed in the department about their validity, as a series of documents filed by the parties indicate. Submitted to the Court is a copy of a letter, the original of which was submitted to the Department of Defense by Amoco Produc-

States Geological Survey's determination that the lands on Ft. Chaffee for which plaintiff was granted leases were not within a known geological structure has come under attack both be-

fore the agency and before this Court, see p. 673 *infra*, that issue is not presented in this litigation.

tion Company as a comment to the department's proposed rule prohibiting the leasing of acquired lands used for military purposes. In that letter it is explained how Amoco Production, like Texas Oil & Gas, had filed lease applications just after the amendment to section 352. On the copy of the letter is a handwritten note signed by an attorney of the Department of Interior assigned to the drafting and comment–analyzing of the regulatory change proposed for section 3101.2–1, which states:

> Dave, have you seen this? These offers are premature and probably should be rejected under Section 2091, but we'd better give some thought to whether we'll have a simo period or an over–the–counter crunch when the final rule is effective. Larry McBride x4803.

Exhibit C to Plaintiff's Motion for Summary Judgment (filed Jan. 18, 1980). 43 C.F.R. § 2091 referred to in the note, the applicability of which is contested by the parties, states:

> Except where regulations provide otherwise, all applications must be accepted for filing. However, applications which are accepted for filing must be rejected and cannot be held pending possible future availability of the land or interests in land, when approval of the application is prevented by:
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (e) The fact that for any reason the land has not been made subject, or restored, to the operation of the public land laws.

43 C.F.R. § 2091.1(e) (1979). Seemingly in opposition to this viewpoint is a memorandum dated July 31, 1978, from the Associate Solicitor of the Energy and Resource Division of the Department of the Interior to the Assistant Secretary of the Land and Water Resources Division concerning the final rule that was published in August 1978 in which it was stated:

> 1. As written, the rule assumes that the many lease applications filed soon after the statute was passed are valid applications, even though they preceded this rulemaking. The rule thus gives these applications priority over those filed after

the rulemaking is published. While we believe this is lawful, it is an open question that may later be disputed by two applicants before the Board of Land Appeals.

Exhibit D to Plaintiff's Motion for Summary Judgment (filed Jan. 18, 1980). Finally, on March 1, 1979, the Associate Director of the Bureau of Land Management (BLM) issued Instruction Memorandum No. 79–287 to all State Directors advising them of the change in section 352 and the final regulation published in August 1978, and suggesting that the directors "process the noncompetitive offers and applications (other than coal and lignite) filed after the effective date of the act, that is August 4, 1976, on a first–come–first–served basis in the same manner as other noncompetitive offers on applications for acquired lands." Exhibit I to Plaintiff's Motion for Summary Judgment (filed Jan. 18, 1980).

Accordingly on June 26, 1979, the offers of Texas Oil & Gas were accepted by the Chief of the Division of Lands and Minerals of the Bureau of Land Management on behalf of the United States and, with the consent of the Corps of Engineers, the twenty leases now in question were granted to plaintiff with an effective date of July 1, 1979. These ten–year leases covered approximately 33,000 acres at a cost of one dollar per acre.

On August 8, 1979, Senator Dale Bumpers of Arkansas wrote a letter to Secretary Andrus in which he questioned the propriety of the issuance of the leases, requested suggestions from the Secretary about legislative changes or amendments to modify the system of lease allocation to remedy what Senator Bumpers felt were inequities and abuses of the system, informed Secretary Andrus that he was requesting a hearing before a Senate subcommittee to examine the entire matter, and urged that no further noncompetitive leases be issued by the department in the interim. Exhibit R to Plaintiff's Motion for Summary Judgment (filed Jan. 18, 1980). A second letter, dated August 10, 1979, was also sent by Senator Bumpers to the Secretary, again

raising questions about the issuance of the leases to plaintiff and stating that hearings had been scheduled before the Subcommittee on Energy Resources and Materials Production for September 12, 1979, to gather information about the authority and regulatory scheme under which the leases were issued and to examine the need for legislative action to amend the leasing procedure. *Id.* Exhibit S. By letter dated August 14, 1979, Senator Wendell Ford of Kentucky, the Chairman of the Energy Resources Materials Production Subcommittee, advised the Secretary of the September 12 hearing date. *Id.* Exhibit T.

On August 13, 1979, the Secretary sent a letter in reply to Senator Bumper's correspondence of August 8 in which he defended the Interior Department's action in granting the noncompetitive leases to Texas Oil & Gas despite the filing of the lease applications prior to the effective date of the regulatory change in 43 C.F.R. § 3101.-2–1 and made certain legislative recommendations. *Id.* Exhibit K. Subsequently, at the September 12 hearing, Interior Department officials again defended the issuance of the leases as proper since the Texas Oil & Gas applications were filed after the date of the amendment of section 352. *Id.* Exhibit Z.

Following the hearing additional correspondence was submitted to Secretary Andrus concerning the Texas Oil & Gas leases. On September 13, 1977, a letter signed by Senator Bumpers, Senator Ford, Senator Henry Jackson of Washington, and Senator Henry Bellmon of Oklahoma was sent to the Secretary in which the issuance of the leases to Texas Oil & Gas was criticized on a number of grounds, including the decision to process the applications despite the fact they were filed before the final revision of section 3101.2–1. *Id.* Exhibit U. The Senators also requested that a moratorium be placed on the further issuance of noncompetitive leases within military reservations until such time as administrative and legislative changes had been made in the leasing system. *Id.* On September 14, 1979, Senator Bumpers wrote again to request information on lease assignments and, in the

course of that letter, generally criticized the system for the issuance of noncompetitive oil and gas leases. *Id.* Exhibit V. On September 17, 1979, Senators Bumpers, Jackson, and Bellmon again wrote the Secretary to urge that he impose a moratorium on the issuance of noncompetitive leases and that he review the circumstances surrounding the granting of the Texas Oil and Gas leases with an eye toward canceling them. *Id.* Exhibit W.

On September 17, 1979, Arkla Exploration Company filed a protest with the department to challenge the Texas Oil & Gas leases. Arkla also instituted litigation before this Court four days later to challenge the issuance of the leases, which is now in abeyance pending the outcome of this suit. *Arkla Exploration Co. v. Andrus,* Civ. No. 79–2501 (D.D.C. filed Sept. 21, 1979). See note 1 *supra.*

On September 20, 1979, the Secretary promulgated an order that placed a "hold" on the issuance of any permits to drill on the land leased to Texas Oil & Gas and asked the United States Geological Survey (USGS) to re–evaluate its initial determination that the leased lands were not part of a "known geological structure" (KGS), an important factor in allowing the leases to be issued noncompetitively. Exhibit AA to Plaintiff's Motion for Summary Judgment (filed Jan. 18, 1980). See note 1 *supra.* Apparently unaware of the Secretary's order, Texas Oil & Gas filed an application for a permit to drill with the USGS that same day. *Id.* Exhibit BB. Although the application was found technically sufficient, by letter dated October 5, 1979, USGS refused to issue the permit because of the Secretary's September 20 order. *Id.* Exhibit CC. Plaintiff filed another application to drill on a second location at Fort Chaffee on October 9, 1979, but USGS again declined to issue the permit because of the Secretary's order. *Id.* Exhibits DD, EE. Also on October 9, USGS reported to the Secretary that its initial determination concerning the non–KGS status of the Ft. Chaffee lands was correct. *Id.* Exhibit II.

Further congressional correspondence in support of and in opposition to plaintiff's leases was submitted to the Secretary following his September 20 order. On September 28, 1979, Texas Representatives Jim Wright and Martin Frost and Senator Lloyd Bentsen of Texas wrote to the Secretary. Attachment 4 to Defendant's Motion for Summary Judgment (filed Mar. 14, 1980). While declining to comment on the pending validity of the Texas Oil & Gas leases, they nonetheless sought to bring to the Secretary's attention the circumstances surrounding a dispute between Texas Oil & Gas and Arkla Exploration Company concerning a Texas Oil & Gas application for a permit to build a gas pipeline in Arkansas that was pending before the Federal Energy Regulatory Commission. *Id.* On October 1, 1979, Senator Russell Long of Louisiana wrote to Secretary Andrus to urge the cancellation of plaintiff's leases. Exhibit X to Plaintiff's Motion for Summary Judgment (filed Jan. 18, 1980). Finally, on October 25, 1979, Senator Long and Senator J. Bennett Johnston of Louisiana wrote to the Secretary on behalf of Arkla Exploration Company to "clarify" the record regarding the gas pipeline case before the Federal Energy Regulatory Commission and to urge the Secretary to reach a decision to cancel the plaintiff's leases on Fort Chaffee. *Id.* Exhibit Y.

On November 1, 1979, plaintiff instituted this action, seeking as immediate relief a temporary restraining order to prevent the Secretary from administratively canceling the leases at issue. A hearing date for the application for a temporary restraining order was set for the morning of November 2, 1979. Although the Secretary was informed of that hearing date, on the evening of November 1, he signed an order rescinding plaintiff's leases because the lease appli-

cations were submitted prior to the effective date of the change in 43 C.F.R. § 3101.2–1 and thus had to be rejected under 43 C.F.R. § 3091.1. *Id.* Exhibit FF. The following day, the Court denied the motion for a temporary restraining order but granted plaintiff leave to amend its complaint to encompass the events of the previous evening. At the hearing on November 2, the Court was assured by the Government that the lands at Fort Chaffee would not be leased pending the disposition of this lawsuit.

On January 3, 1980, the United States Geological Survey returned plaintiff's two applications for permits to drill, stating that they could not be processed further because of the cancellation of the leases. Attachment 6 to Defendant's Motion for Summary Judgment (filed Mar. 14, 1980). On February 29, 1980, the Secretary issued an order, effective until further notice, suspending the issuance of all onshore noncompetitive oil and gas leases on both public domain and acquired lands.[2] *Id.* Attachment 5. On March 6, 1980, defendant tendered to plaintiff a United States Treasury check in the amount of $40,434.85 representing the advance paid by plaintiff in connection with its initial applications to lease.

Plaintiff challenges Secretary Andrus' decision to cancel its leases on the lands at Fort Chaffee, a final, administrative order appealable to this Court, on a number of different grounds, any of which, it urges, is sufficient to compel a judicial reversal of that determination and the reinstatement of the leases. Initially, Texas Oil & Gas argues that the Secretary's interpretation of 43 C.F.R. § 3101.2–1 was erroneous because it was the 1976 amendment to 30 U.S.C. § 352, not the change in section 3101.2–1, that opened the lands at Fort

---

**2.** Besides the lease applications submitted by plaintiff for the lands at Ft. Chaffee, before the regulatory amendment of 43 C.F.R. § 3101.2–1 it had also filed for noncompetitive leases on other acquired lands on military reservations. Those lease applications were not granted prior to the Secretary's actions of November 1, 1979, and, as a result thereof, were rejected on November 30, 1979, as filed before the effective

date of the change in section 3101.2–1. Plaintiff has filed another action challenging the nullification of those lease applications and the moratorium the Secretary has placed upon further leases, in which a memorandum opinion and order is filed this date. *Texas Oil & Gas Corp. v. Andrus,* 498 F.Supp. 677 (D.D.C. 1980.)

Chaffee to leasing, rendering improper defendant's invocation of 43 C.F.R. § 2891.1 to reject the leases.

It is well–established that, absent any congressional enactment withdrawing such authority, it is within the power of the Secretary of the Interior to cancel administratively any lease that was invalid from its inception because it was issued in violation of departmental regulations or statute. *Boesche v. Udall,* 373 U.S. 472, 476–77, 83 S.Ct. 1373, 1375–1376, 10 L.Ed.2d 491 (1963); *Winkler v. Andrus,* 614 F.2d 707, 711 (10th Cir. 1980). In *Boesche,* in ruling on the propriety of the Secretary's cancellation of a noncompetitive oil and gas lease issued for certain public domain lands under the authority of the Mineral Leasing Act of 1920, 30 U.S.C. § 226, the Court, citing those statutes giving the Secretary the general authority to administer the public lands, 43 U.S.C. §§ 2, 1201, 1457, found nothing in the Mineral Leasing Act that would in any way abrogate the Secretary's authority to cancel the leases administratively because of their incipient invalidity. *Boesche v. Udall, supra,* 373 U.S. at 476, 83 S.Ct. at 1375. While the Secretary's authority to grant leases for acquired lands comes from the Mineral Leasing Act for Acquired Lands rather than the Mineral Leasing Act that was involved in *Boesche,* it is apparent that Congress, in granting the Secretary the authority to issue mineral leases on acquired lands, bestowed that responsibility "under the same conditions as [are] contained in the leasing provisions of the Mineral Leasing Act." H.R.Rep.No.550, 80th Cong., 1st Sess. 2 (1947), *reprinted in* [1947] U.S.Code Cong.Serv., pp. 1661, 1662. There being nothing in the Mineral Leasing Act for Acquired Lands that in any way deprives the Secretary of the authority to

cancel leases issued in violation of statute or regulation, under the proper circumstances the Secretary could exercise such power to invalidate oil and gas leases, including plaintiff's.

In exercising his authority to cancel the leases in this instance, the Secretary, invoking the maxim that an agency must follow its own regulations, *see, e. g., Panhandle Eastern Pipeline Co. v. FERC,* 198 U.S.App. D.C. 387, 398 & n.84, 613 F.2d 1120, 1135 & n.84 (1979) (citing authorities), declared plaintiff's leases invalid because they were issued on the basis of applications that should have been rejected under 43 C.F.R. § 2091.1(e) in that they sought leasehold interests in lands "not ... subject ... to the operation of the public land laws."[3] The propriety of this action depends entirely on the meaning of the regulation's language "subject ... to the operation of the public land laws" as it relates to the congressional action in 1976 removing the prior statutory restriction on the leasing of military lands and the regulatory change in 1978 to reflect the statutory amendment.

Despite plaintiff's protestations to the contrary, it is apparent that in amending the Mineral Leasing Act for Acquired Lands in 1976, Congress gave the Secretary discretionary authority, rather than a mandate, to allow military lands to be leased for oil and gas production. The use of the term "may" in the statute is dispositive of this point. *See Burglin v. Morton,* 527 F.2d 486, 488 (9th Cir.), *cert. denied,* 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796 (1976). What is not so clear is whether it was this statutory amendment or the later regulatory change in 43 C.F.R. § 3101.2–1(f) that "subjected" those lands to the operation of the mineral leasing laws, within the meaning of 43 C.F.R. § 2091.1(e). Examining the 1976

---

**3.** Although plaintiff has challenged the applicability of 43 C.F.R. § 2091.1 to situations involving acquired lands, this contention is without merit. That section is a part of those regulatory provisions of the Bureau of Land Management that apply generally to land resource management without distinguishing between public domain and acquired lands. 43 C.F.R. chap. II, subchap. B (1980). Moreover, in light of section 2091.1's applicability to lease appli-

cations filed under the Mineral Leasing Act, *McTiernan v. Franklin,* 508 F.2d 885, 887–88 & n. 3 (10th Cir. 1975), and the congressional mandate that the Secretary's rules and regulations governing acquired lands "shall be the same as those prescribed under the mineral leasing laws to the extent that they are applicable," 30 U.S.C. § 359 (1976), the Court finds no basis for holding that section 2091.1 is not relevant here.

statute and its legislative history, there is nothing to indicate that Congress desired or compelled the acceptance of either interpretation. Rather, the question was one of construction of the language of section 2091.1(e).

 The judicial deference to which an agency's interpretation of its own regulation is afforded is great, such that if several reasonable interpretations are available, the agency's construction need only be one of those, and not necessarily the most reasonable of the alternative interpretations.[4] *See, e. g., Expedient Services, Inc. v. Weaver,* 614 F.2d 56, 57 n.1 (5th Cir. 1980); *Belco Petroleum v. FERC,* 191 U.S.App.D.C. 157, 163 n.5, 589 F.2d 680, 686 n.5 (1978). In considering the language and purpose of the 1976 amendment and the regulation, the Court can only conclude that the Secretary could reasonably have given the regulations either of the interpretations espoused by the parties here. That choice resided with the department, and ultimately with Secretary Andrus as head of the agency. As such, his decision to invalidate the leases was proper as based on a reasonable interpretation of his own regulations which, in turn, required that the applications to lease be rejected.[5]

Anticipating such a determination, plaintiff puts forth two other theories under which it contends that the Secretary's action in canceling the leases should be declared invalid. First, Texas Oil & Gas argues that the Secretary should be estopped from invalidating its leases because plaintiff could have "top–filed" the lease applications after the August 1978 effective date of the amended section 3101.2–1, thereby depriving the Secretary of his legal justification for rescinding the leases, but did not do so in reliance on the oral representations of certain BLM officials about the validity of the applications as filed.

 It is established that the doctrine of estoppel is to be applied to the government only in the most extraordinary circumstances and with the greatest care and circumspection. *See, e. g., L'Enfant Plaza Properties, Inc. v. District of Columbia Redevelopment Land Agency,* 184 U.S.App. D.C. 30, 39, 564 F.2d 515, 524 (1977); *Hoeber v. District of Columbia Redevelopment Land Agency,* 483 F.Supp. 1356, 1366 (D.D. C.1980). This is especially so in instances relating to the public lands. *United States v. Eaton Shale Co.,* 433 F.Supp. 1256, 1272 (D.Colo.1977). The party asserting an estoppel must not only establish that equitable principle's traditional elements—false representation, a purpose to invite action by the party to whom the representation was made, ignorance of the true facts by that party, and reasonable reliance—but must also make a showing of an injustice to him and a lack of undue damage to the public interest. *Hoeber v. District of Columbia Redevelopment Land Agency, supra,* 483 F.Supp. at 1365–66.

---

4. Despite certain substantive overtones, section 2091.1(e) basically is a procedural regulation in that it establishes certain criteria that will govern whether an application should be considered by officials as properly lodged with the department. Although the practical problems of accepting such applications are obvious, nonetheless there appears to be nothing in the statutory scheme that would prevent the department from considering lease applications for lands not yet "open" to oil and gas exploration as properly filed whenever received, the issuance of the leases being subject to the availability of such lands under the laws governing mineral rights to public lands.

5. Charging a violation of due process, plaintiff also asserts that the Secretary's order invalidating its leases should be overturned because it was not afforded a hearing prior to their cancellation. Under the circumstances here, in which the Secretary invalidated leases that were issued subject to cancellation for defects like that strictly legal deficiency that was found to exist, the lack of a hearing fails to violate due process under either the fifth amendment, *see Gray v. Johnson,* 395 F.2d 533, 536–37 (10th Cir. 1966), *cert. denied,* 392 U.S. 906, 88 S.Ct. 2056, 20 L.Ed.2d 1364 (1968), or the Administrative Procedure Act, 5 U.S.C. §§ 553– 554, *see, e. g., Public Serv. Co. v. FERC,* 195 U.S.App.D.C. 130, 141, 600 F.2d 944, 955 (1979); *Independent Bankers Assoc. v. Board of Governors of the Federal Reserve System,* 170 U.S.App.D.C. 278, 292, 516 F.2d 1206, 1220 (1975); *Citizens for Allegen County v. FPC,* 134 U.S.App.D.C. 229, 232, 414 F.2d 1125, 1128 (1969).

In applying this analytic framework to the circumstances of this litigation, it is apparent that the doctrine of estoppel is not appropriately invoked. Plaintiff's reliance upon alleged telephone conversations with BLM officials can hardly be called reasonable in light of the Interior Department's comments accompanying its proposal to amend section 3101.2–1, 42 Fed.Reg. 46558 (1977), which placed plaintiff on notice of the possibility of a departmental interpretation of section 3101.2–1 in line with that ultimately made by the Secretary in November 1979. *Cf. Udall v. Oelschlaeger*, 389 F.2d 974, 977 (D.C.Cir.), *cert. denied*, 392 U.S. 909, 88 S.Ct. 2056, 20 L.Ed.2d 1367 (1968). Moreover, while there is undoubtedly some injustice rendered plaintiff by the cancellation of its leases, it cannot be said that the decision of the Secretary is contrary or detrimental to the public interest in the equitable leasing of the public lands. Estoppel simply will not lie in this instance.

Finally, relying on the seminal case of the United States Court of Appeals for the Fifth Circuit in *Pillsbury Co. v. FTC*, 354 F.2d 952 (5th Cir. 1966), and authority from this circuit, *American Public Gas Association v. FPC*, 186 U.S.App.D.C. 23, 567 F.2d 1016 (1977), *cert. denied*, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978); *D.C. Federation of Civic Associations v. Volpe*, 148 U.S.App.D.C. 207, 459 F.2d 1231 (1971), *cert. denied*, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972), plaintiff asserts that the Secretary's action should be reversed because it was improperly motivated by pressure from members of Congress. Although the content of the letters submitted to the Secretary by various Congressmen and Senators and the implication arising from the timing and subject matter of the subcommittee hearing in September 1979 can be termed "regrettable and quite inconsistent with that due regard for the independence of the [Secretary] which Congress and the courts must maintain," *American Public Gas Association v. FPC, supra*, 186 U.S.App. D.C. at 77, 567 F.2d at 1070, nonetheless this evidence, when taken as a whole, is insufficient to establish that the Secretary's decision was improper as rendered for political rather than policy reasons. *See, Sun Oil Co. v. United States*, 572 F.2d 786, 812–13 (Ct.Cl.1978); *American Public Gas Association v. FPC, supra*, 186 U.S.App.D.C. at 77, 567 F.2d at 1070. Accordingly, the Secretary's order cancelling plaintiff's leases must stand and plaintiff's requests for declaratory and injunctive relief are denied.

Having concluded that the Secretary's cancellation of plaintiff's leases must stand, the question of the validity of defendant's action in denying plaintiff a drilling permit for the Ft. Chaffee lands need not be reached.