**TEXAS OIL AND GAS CORPORATION, Appellant,**

v.

**James G. WATT, Secretary of the United States Department of the Interior. (Two cases)**

Nos. 80–2297, 80–2302.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 2, 1981.

Decided June 11, 1982.

---

Bradley D. Jesson, Fort Smith, Ark., and Craig R. Carver, Denver, Colo., with whom John A. Carver, Jr., Denver, Colo., James W. McDade, Washington, D. C., Jason Warran, and Marilyn R. Saint-Just were on the briefs, for appellant.

Jerry Jackson, Atty., Dept. of Justice, Washington, D. C., with whom Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., was on the brief, for appellee. James W. Moorman, Kay L. Richman, and Edward J. Shawaker, Attys., Dept. of Justice, Washington, D. C., also entered appearances for appellee.

Alan S. Novins, Washington, D. C., with whom Martin Lobel, Lee Ellen Helfrich, Washington, D. C., and Robert Roberts, III, Shreveport, La., were on the brief, for amicus curiae, Arkla Exploration Co., urging affirmance in No. 80–2297.

Before ROBB and MIKVA, Circuit Judges, and LUMBARD,* Senior Circuit Judge for the Second Circuit.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

This case involves appeals by Texas Oil & Gas Corp. ("TXO") from judgments of the district court upholding a decision of the Secretary of the Interior that cancelled oil and gas leases issued to TXO for parcels of land at Fort Chaffee, Arkansas; rejected TXO's outstanding lease applications for lands at Malmstrom Air Force Base in Montana; and declared a moratorium on oil and gas leasing of all lands acquired by the federal government for military or naval

purposes. TXO challenges the district court's decisions with respect to all three elements of the Secretary's action. With regard to the cancellation of TXO's leases and the rejection of its applications, we reverse. The issue concerning the leasing moratorium has become moot, so we do not address it.

## I. BACKGROUND

The statutory scheme for leasing federal government lands is somewhat complex. Congress first authorized mineral exploration and development of government lands in 1920, when it gave the Secretary discretionary authority to open "public domain lands" to leasing. Act of Feb. 25, 1920, ch. 85, 41 Stat. 437 (current version at 30 U.S.C. §§ 181–263 (1976)). Public domain lands, or public lands, means lands claimed by the United States as part of its national sovereignty. It was not until 1947 that Congress authorized mineral leasing on lands "acquired" by the federal government from private owners for various public purposes. Act of Aug. 7, 1947, ch. 513, 61 Stat. 913 (current version at 30 U.S.C. §§ 351–359 (1976)) ("Mineral Leasing Act for Acquired Lands" or "MLAA"). Under the 1947 legislation, "lands acquired by the United States ... [and] set apart for military or naval purposes" were excluded from leasing. Id. § 352. Under both statutes oil and gas leasing could be conducted by means of competitive bidding if the lands were within a known oil and gas field, or noncompetitively where the land, if leased at all, was to be leased to the first qualified applicant at $1.00 per acre per year (plus royalties if any oil or gas was found).

Pursuant to the military exclusion in the Mineral Leasing Act for Acquired Lands, the regulations of the Department of the Interior ("Interior") tracked the exclusion and prohibited any mineral leasing on military lands. 43 C.F.R. § 3101.2–1(f) (1976). In 1976 Congress removed the exclusion from the statute, thus making military lands subject to leasing at the Secretary's discretion. Federal Coal Leasing Amend-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

ments Act of 1975, § 12(a), Pub.L.No. 94–377, 90 Stat. 1090 (codified at 30 U.S.C. § 352 (1976)) ("the 1976 Amendments").[1] For the time being, Interior did nothing to alter its regulation as it had existed prior to the congressional action of 1976.

In May of 1977, some nine months after the 1976 Amendments, TXO, the appellant in this case, filed applications with Interior's Bureau of Land Management ("BLM") for noncompetitive oil and gas leases on lands at Fort Chaffee in Arkansas and Malmstrom Air Force Base in Montana. It was not until four months after TXO had filed its applications that the BLM began the process of changing its pre-1976 regulation that had tracked the statutory prohibition on leasing military lands. The BLM published a notice of proposed rulemaking in the Federal Register (hereinafter, "the 1977 Notice"), which proposed to alter Regulation 3101.2–1 to reflect the 1976 Amendments. 42 Fed.Reg. 46,558 (1977). The 1977 Notice announced in its "Summary" section that the proposed rule would "authorize the Department of the Interior to lease lands acquired for military or naval purposes," *id.*, and that amending § 3101.1

"would reflect the authority granted the Department by section 12(a) of the Federal Coal Leasing Amendments Act of 1975 .... This regulation would increase the amount of land available for oil and gas leasing," *id.* In addition, the following statement was made under the heading "Supplementary Information:"

> Section 12(a) of the Federal Coal Leasing Amendments Act of 1975 ... repealed the prohibition against the leasing proposed here. The regulatory prohibition reflecting the old statutory provision remains in effect, serving as an exercise of the Secretary's new authority to lease or not to lease such deposits.

*Id.* The amendment to the regulation itself became effective in September 1978, *see* 43 Fed.Reg. 37,202 (1978).

Notwithstanding the 1977 Notice, which would seem to have frozen any such leasing until the rulemaking was completed, the BLM proceeded to process TXO's applications. In July 1979, the company received twenty out of thirty-eight leases sought at Fort Chaffee.[2] The Malmstrom Air Force Base applications initially were denied,[3] but

---

1. Prior to the 1976 Amendment, the statute read in pertinent part as follows:

   Except where lands have been acquired by the United States for the development of the mineral deposits, by foreclosure or otherwise for resale, or reported as surplus pursuant to the provisions of the Surplus Property Act of 1944, all deposits of coal, phosphate, oil, oil shale, gas, sodium, potassium, and sulfur which are owned or may hereafter be acquired by the United States and which are within the lands acquired by the United States (exclusive of such deposits in such acquired lands as are (a) situated within incorporated cities, towns and villages, national parks or monuments, (b) *set apart for military or naval purposes*, or (c) tidelands or submerged lands) may be leased by the Secretary under the same conditions as contained in the leasing provisions of the mineral leasing laws, subject to the provisions hereof. (Emphasis added.) The amendment merely deleted exception (b) and redesignated exception (c) as exception (b).

2. Eighteen applications were rejected because the lands covered by them were found to be within a known geological structure and therefore subject to leasing only on the basis of competitive bidding.

3. Initially the Malmstrom applications were rejected by an official in the Montana branch office of the BLM, on the ground that the Mineral Leasing Act for Acquired Lands excluded the lands involved from leasing. *See* Appendix (App.) to No. 80–2302, at 40. TXO brought the 1976 Amendments to the attention of this official, whereupon he vacated his earlier decision. *See id.* at 45. Next, the commander of the Malmstrom Air Force Base, whose consent as the official in charge of the surface of the original lands in question was necessary before a lease could be granted, *see* 30 U.S.C. § 352 (1976), decided that national security considerations dictated that no leasing should take place. TXO then persuaded the base commander to reconsider his decision and consult with Department of Defense officials with regard to it. *See* App. to No. 80–2302, at 49. Meanwhile the BLM held in abeyance its decision rejecting the applications because of the commander's lack of consent, pending a possible different result after review by the Department of Defense. *See id.* at 51–52. That still was the status of the Malmstrom applications when the Secretary endeavored to reject them on November 1, 1979.

they were held for further consideration and a final decision with regard to them was pending during the summer of 1979.

The grant of the twenty leases at Fort Chaffee generated some negative publicity, as well as a "protest" from another company, Arkla Exploration Company (Arkla).[4] From August to October, 1979, a number of Senators contacted then-Secretary of the Interior Andrus to express their dissatisfaction with the BLM's noncompetitive mineral leasing procedures in general and with the grant of the Fort Chaffee leases in particular.[5] *See* Letters to Secretary Andrus from Senator Bumpers, August 8 and 10 and September 14, 1979, Appendix (App.) to No. 80–2297, at 90, 92, 101; from Senators Jackson, Ford, Bumpers, and Bellmon, September 13, 1979, *id.* at 95; from Senators Jackson, Bumpers, and Bellmon, September 17, 1979, *id.* at 103; from Senator Long, October 1, 1979, *id.* at 106; from Senators Long and Johnston, October 25, 1979, *id.* at 107.[6] In his responses to these communications, Secretary Andrus indicated that he, too, was not satisfied with the way noncompetitive leasing was being carried out. He stated, however, that the TXO leases had been granted in accordance with law:

Until 1976, there was no authority to lease, either competitively or noncompetitively, acquired lands within the boundaries of military reservations. Section 12 of the Federal Coal Leasing Amendments Act of 1975 amended section 3 of the Mineral Leasing Act for Acquired Lands (30 U.S.C. 351, 352) to permit oil and gas leasing on such lands and because of energy needs, there were efforts made to pursue such leasing. As a result, the lands within Fort Chaffee were open to application for noncompetitive leases just like other acquired lands. In May of 1977, the Texas Oil and Gas Company filed approximately 50 such applications for land within the Fort. Thirty of the applications were either rejected or withdrawn by the company because either 1) the Army refused to permit leasing, 2) it was determined that there were no Federal mineral interests within the application area or 3) the USGS had identified the areas as a KGS [Known Geological Structure]. Because the company was the first qualified applicant on the other 20 lease applications and the lands were not qualified as a KGS, leases were issued by the Bureau of Land Management on these tracts according to routine procedures of the noncompetitive leasing system.

4. Arkla next filed a suit in district court seeking to have the Fort Chaffee leases declared invalid. *Arkla Exploration Co. v. Andrus*, Civ.No. 79–2501 (D.D.C. filed September 21, 1979). Its suit was held in abeyance pending the decision of the district court in the case before us, and then it was dismissed without prejudice.

Arkla was granted leave to file a brief *amicus curiae* in the instant case and to participate in oral argument. Arkla adopted the Secretary's arguments and urged in addition that the Fort Chaffee leases were void *ab initio* because their issuance was the result of a secret repeal of the pre-amendment Department of the Interior regulations at 43 C.F.R. § 3101.2–1, in violation of the publication requirements set forth in the Administrative Procedure Act, 5 U.S.C. § 552(b) (1976). We must reject Arkla's argument, because our holding with regard to the effect of the 1976 statutory amendment means that it was possible for leasing to take place without a change in the regulation at § 3101.2–1.

5. In addition, Senator Wendell H. Ford called a hearing for the express purpose of considering

the Fort Chaffee leases. *See* Letter to Secretary Andrus from Senator Ford, August 14, 1979, App. to No. 80–2297, at 94. The Interior Department officials designated by Secretary Andrus to testify at the hearing all expressed the view that the Fort Chaffee leases had been issued in accordance with law. *See, e.g., Oil and Gas Leasing of Lands Belonging to Fort Chaffee, Arkansas: Hearings Before the Subcommittee on Energy Resources and Materials Production of the Senate Committee on Energy and Natural Resources*, 96th Cong., 1st Sess. 50–56 (1979) (Statement of Donald P. Truesdell, Acting Asst. Director for Energy and Mineral Resources, BLM, *quoted in text, infra*) (hereinafter cited as *Fort Chaffee Hearings*).

6. The record indicates that TXO was itself not without some congressional allies in this affair. *See* Letter to Secretary Andrus from Representative Wright, Senator Bentsen, and Representative Frost, September 28, 1979, App. to No. 80–2297, at 274.

In summary, these leases were issued pursuant to law as part of a program which was functioning on a regular basis. Letter from Secretary Andrus to Senator Bumpers, August 13, 1979, App. to No. 80–2297, at 68, 68–69.

On September 20, 1979, Secretary Andrus issued a memorandum to the Director of the U. S. Geological Survey, instructing him to review earlier geological determinations with regard to TXO's Fort Chaffee applications and not to approve any applications for drilling permits on the lands leased to TXO. *See* App. to No. 80–2297, at 118. The company interpreted this move as a concession to political pressure and began to fear that the Secretary would attempt to rescind the Fort Chaffee leases. Consequently TXO sought a temporary restraining order in the district court on November 1, 1979, so as to prevent the Secretary from ordering such a rescission.

The application for a TRO was set for oral argument on November 2, 1979. On the evening of November 1, however, Secretary Andrus issued a decision in which he cancelled the twenty Fort Chaffee leases and rejected all pending applications for leases on lands acquired for military or naval purposes that had been filed prior to September 21, 1978, the effective date of the new Department regulation tracking the 1976 amendment to the MLAA. *See* App. to No. 80–2297, at 139, 140–41. In addition, he declared a moratorium on the leasing of all acquired military and naval lands, pending a full reevaluation of the noncompetitive leasing procedures. *Id.*

The status quo thus having been altered, the district court determined that it could not grant a TRO, but that TXO could amend its complaint to convert the suit into one for permanent relief. TXO did so. The company also brought a separate suit with respect to the rejection of the Malmstrom Air Force Base applications and the general leasing moratorium.

In two memorandum opinions issued on September 25, 1980, *Texas Oil & Gas Corp. v. Andrus*, 498 F.Supp. 668 (D.D.C.1980); *id.* at 677, the district court found for the Secretary on his cross-motions for summary judgment. TXO appealed from both decisions, and its appeals were consolidated. For the reasons indicated below, we reverse in both cases.

## II. DISCUSSION

TXO maintained below and reiterates on this appeal that the Secretary erred in thinking that his regulations required him to cancel the Fort Chaffee leases and reject the Malmstrom applications. The district court treated this issue of the Secretary's duty as hinging on an agency's interpretation of its own regulations. While the court was of the opinion that other interpretations were plausible, it nevertheless decided that the Secretary's interpretation was owed considerable deference and should be accepted because it was reasonable.

We conclude that the district court's approach led it to an erroneous result. In view of the circumstances of this case, we believe that the Secretary's eleventh-hour interpretation of his duty is owed no great degree of deference. Based on our examination of the statutory language that is relevant to this case, we have little trouble in concluding that the Secretary was mistaken in believing that he was required to act as he did. His actions merit reversal because they were contrary to law and in excess of statutory authority under 5 U.S.C. § 706 (1976). Consequently TXO's Fort Chaffee leases were validly issued and must be reinstated, and the company must be restored to its place at the head of the line for the Malmstrom leases.

### A. *The Rationale for the Secretary's Action*

The Secretary premised his decision to cancel the Fort Chaffee leases and to reject the pending Malmstrom applications on the imperative language of Section 2091.1 of the Interior Department regulations, which requires the rejection of applications if "for any reason the land has not been made subject, or restored, to the operation of the public land laws." 43 C.F.R. § 2091.1

(1981). We think the Secretary's reliance on the language and meaning of the Departmental regulations was misplaced. From the time of the amendment of the statute by Congress until November 1, 1979, when the Secretary cancelled TXO's leases, the Department consistently and positively took the position that the military lands were open for leasing, in the Secretary's discretion. This interpretation of the law was expressed in rulings, letters, and instruction memoranda by department officials, including the Associate Solicitor for Energy and Resources. *See* App. to No. 80–2297, at 58. As mentioned, *see* Part I *supra*, the Secretary himself took that position in a letter to Senator Bumpers. And on September 12, 1979, Donald P. Truesdell, BLM Acting Assistant Director for Energy and Mineral Resources, testified before the Subcommittee on Energy Resources and Materials, as follows:

> In view of this change in the law, even though the regulations had not been amended to reflect the change, the Eastern States Office [of the BLM] would have had no basis to reject the applications.
>
> It is our view that the law itself was record notice to all interested parties and all had an opportunity to file. As has been previously stated, over 800 applications have been filed so far that we are aware of, by 25 to 30 companies. They are still coming in. These figures cover military reservations throughout the United States.

*Fort Chaffee Hearings, supra* note 5, at 52. Even if the Department had not so construed the statutory situation, we would be obliged to do so.

The prevention of the approval of lease applications turns on our being able to find that the lands in question were not "subject, or restored, to the operation of the public lands laws." Our examination of this key phrase can proceed without our sharing the district court's deference to the Secretary's interpretation. We are not dealing with the situation where an agency's construction of its own regulation normally will defeat other plausible constructions, *see, e.g., Belco Petroleum Co. v. FERC*, 589 F.2d 680, 686 n.5 (D.C.Cir.1978). Instead, we are considering the proper construction of a *statute*, because it is necessary to interpret the 1976 Amendments in order to decide what the regulation means.[7] If the 1976 Amendment is interpreted to have subjected acquired military or naval lands to the public lands laws, then we must reject the Secretary's assertion that only his discretionary decision to open lands for leasing accomplishes that result.

Clearly the 1976 Amendments that removed the military base exclusion "restored" or made these lands "subject" to leasing. They clearly were put outside the regulatory prohibition by the operation of law. The Secretary urges that this plain meaning is thwarted by the impact of the explanatory material accompanying his 1977 proposal to amend Section 3101.2–1 of the regulations. The explanatory language purported to freeze any leasing pending the rulemaking by "serving as an exercise of the Secretary's new authority to lease or not to lease such deposits." The Secretary exceeds his authority when he equates his discretion with the impact of the statutory amendments of 1976.

In the 1976 Amendments, language excluding a category of acquired lands from a

---

7. We proceed here from the awareness that "the courts are the final authorities on issues of statutory construction," *Federal Election Commission v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981). We also are mindful that the "thoroughness, validity and consistency of an agency's reasoning are factors that bear upon the amount of deference to be given an agency's ruling," *id.* at 37, 102 S.Ct. at 44. Given the circumstances of the case before us,

however, we conclude that such factors suggesting a deferential approach on our part are wholly absent. In particular, with regard to the criterion of consistency we point out that the Secretary's decision contradicts his own earlier statements, *see* Letter from Secretary Andrus to Senator Bumpers, Aug. 13, 1979, App. to No. 80–2297, at 68, 68–69, *quoted in text supra*, Part 1, and is inconsistent with BLM practice from 1977 on.

statute allowing for leasing merely was stricken out of the statute. This does not mean that the lands must be leased, for that decision indisputably is in the Secretary's discretion. Nevertheless, the Secretary's decision to announce that certain lands are "available" cannot logically constitute subjection of the lands to the operation of the statute. The very existence of discretion—once absent with regard to lands acquired for military or naval purposes, but now present—is established by the statute and by the statute alone. There is no relevance to the fact that the various details relating to mineral leasing prescribed by statute come into play only if and when the Secretary has decided to lease certain lands. The alteration of the lands' status, from one in which leasing is prohibited to one in which it is allowed, has already been brought about by statute.[8] That alteration clearly is the result of the "operation" of the 1976 Amendment on the lands in question.[9]

We find it impossible, therefore, to agree with the Secretary's interpretation of his regulation at 43 C.F.R. § 2091.1(e). To do so would require us to interpret the current section 352 of the Mineral Leasing Act for

Acquired Lands in a way that defies common sense and the ordinary meaning of words. When Congress speaks, its words become law at that time, not when someone else repeats the message later on.

In addition, we note that an interpretation such as that advanced by the Secretary, which would allow for statutory amendments to become effective only after agency tracking regulations have been changed to reflect the statute in its current version, would work mischievous results that cannot have been intended by Congress. Persons affected by statutes implemented by agency discretion would not know where to look to determine when and to what extent the status quo had been altered. And we cannot allow an agency to ignore a statutory amendment for a time and later claim, as here, that regulations based on the unamended statute render void any actions taken in accordance with the clear language of the amended statute.[10] An agency possessed of discretion may exercise it or not; but it may not exercise it and then take back its action on the ground that, based on the duty to adhere to its own regulations irrespective of

---

**8.** We note further that 30 U.S.C. § 226 (1976), headed "Lease of oil and gas lands," refers to the Secretary's authority to lease "[a]ll lands subject to disposition under this chapter." And the Secretary's own current regulation tracking this statutory provision with regard to acquired lands employs language that is even easier to equate with the phrase "made subject to the operation of the public land laws." In 43 C.F.R. § 3101.2–1 (1981), "Availability of lands," we encounter the phrase "lands subject to disposition under the [Mineral Lands Leasing] Act."

**9.** Indeed, it is not surprising that the Secretary himself has described the effect of the 1976 Amendment in terms that accord with our interpretation. In his memorandum to the Director of the BLM instituting the moratorium on oil and gas leasing on acquired lands, which was attached to the November 1, 1979, decision cancelling TXO's leases and rejecting its applications, the Secretary stated that "[t]hese lands were made subject to the Mineral Leasing Act for Acquired Lands by section 12(a) of the Federal Coal Leasing Amendments Act of 1976." App. to No. 80–2297, at 142 (citations omitted).

**10.** The explanatory material in the 1977 notice of proposed rulemaking, quoted in Part I *supra*, does not alter this conclusion. TXO's applications were filed after the 1976 statutory amendment and were processed after the new regulation at 43 C.F.R. 3101.2–1 became effective in September 1978. The notice could have been viewed as an expression of Interior Department policy prior to the effective date of the new regulation, and perhaps therefore as a basis for rejection of premature applications at the time of filing. But the notice itself was not a rule, and it referred only to *leasing*, with no mention whatever of *filing*. The BLM's action—or inaction—in retaining TXO's applications could certainly have been regarded by the company as an indication that the applications were not prematurely filed, thus rendering unnecessary a refiling after September 21, 1978. In any event, the record appears to indicate that the company actually did approach the BLM for guidance on the refiling question, and was assured that refiling would not be necessary. See Affidavit of Lin Patterson, TXO Assistant General Counsel, Jan. 11, 1980, App. to No. 80–2297, at 75.

434

what the statute says, it lacked the discretion in the first place.

It may be argued that the authority to reject—that is, to refuse to accept for filing—premature applications necessarily inheres in the authority to decide which lands to lease. If specific parcels of land have not yet been made available for the granting of leases, then there may be no reason for the Secretary to allow applications covering them to be filed. Indeed, considerations of efficiency in the utilization of personnel and office space suggest that it would be in the interest of the BLM not to allow filing of applications in advance of an announcement that leasing will take place. Even if such authority is found to exist, however, it cannot serve as the basis for the Secretary's action in this case. Otherwise we would be sanctioning a retroactive exercise of discretion to which it is impossible to ascribe any rational purpose. It may well be prudent and efficient for the Secretary to refuse to accept premature applications; but accepting them for filing and processing them after September 21, 1978, when a regulation opening lands for leasing went into effect, strips a *later* rejection on prematurity grounds of all possible benefit to the BLM. Moreover, the effort spent in processing the application is entirely wasted; a net *loss* in efficiency results.

B. *Political Impropriety*

TXO vigorously contends that the Secretary's action was the result of improper political pressure on the part of several Senators. The district court termed the role of the Senators " 'regrettable and quite inconsistent with that due regard for the independence of the [Secretary] which Congress and the courts must maintain,' " 498 F.Supp. at 677 (quoting *American Public Gas Association v. FPC*, 567 F.2d 1016, 1070 (D.C.Cir.1977), *cert. denied*, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978)). The court declined to conclude, however, that the Secretary's action was so improper that a reversal was required on that ground alone. We need not decide for ourselves whether the Secretary's capitulation to po-

litical pressure would require us to overturn his actions, because we have found a separate ground for reversal. We note, however, that while the frequent and forceful communications by several Senators amounted to "pressure" in a general sense and indeed may be regarded as "regrettable," they did not contain anything like the sort of threats that this court has suggested could serve as evidence of improper motivation for an agency's action. *See D.C. Federation of Civic Associations v. Volpe*, 459 F.2d 1231, 1245–48 (1971), *cert. denied*, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972).

C. *The Moratorium*

TXO challenges the Secretary's general moratorium on leasing of lands acquired for military or naval purposes, on the theory that the action was not in conformity with the procedural requirements of the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701–1782 (1976). The district court concluded that TXO, having lost on its challenge to the rejection of its pending lease applications, no longer had any applications pending and therefore lacked standing to challenge the imposition of the leasing moratorium. An intervening event moots this issue. Effective August 10, 1981, the Department of the Interior lifted the leasing moratorium with respect to lands for which no applications had been filed prior to September 21, 1978, when the new Department regulation tracking the 1976 statutory amendment went into effect. *See* 46 Fed.Reg. 37,250 (July 20, 1981). As indicated in an Interior Department memorandum of June 5, 1981, filed with this court, the moratorium remains in place with regard to lands covered by pre-September 21, 1978 applications, pending the outcome of this and any other relevant litigation. At that time the moratorium will be lifted from those lands as well, and noncompetitive leasing will proceed, with priorities to be assigned in accordance with the courts' decisions. Consequently there is no longer any reason to determine whether the moratorium was lawful in the first place.

435

**D.** *Remedy*

The first consequence that flows from our decision is that the Fort Chaffee leases must be reinstated. We have rejected the Secretary's proffered rationale for cancellation; the leases were valid when issued. And there is no suggestion in this case of the sort of conduct on the part of the lessee, such as default on royalty payments, that would justify cancellation under 43 C.F.R. § 3108.3 (1981). Therefore the validity of the issued leases continues undiminished. In addition, we see no reason why TXO should not receive favorable action on its applications for drilling permits on two of the leased parcels at Fort Chaffee, which have been held in abeyance since September 20, 1979.

With regard to the Malmstrom applications, which the Secretary improperly rejected, they must have priority over junior applications, *if* the Secretary proceeds with noncompetitive leasing under the procedure dealing with "regular" applications. This conclusion plainly is required by statute and regulation. The provision of the mineral leasing laws that applies to the leasing of acquired lands states unequivocally that where leasing is to take place, and the land is "not within any known geological structure [KGS] of a producing oil or gas field," then "the person first making application for the lease who is qualified to hold a lease under this chapter shall be entitled to a lease." 30 U.S.C. § 226(c) (1976). And the current regulation dealing with the determination of priorities with regard to regular filing in the noncompetitive leasing scheme tracks the statute, stating that "[n]o lease shall be issued before final action has been taken on any prior offer to lease the land." 43 C.F.R. § 3110.1–6(a) (1981). Because the Malmstrom lands have not been found to be within a KGS, and because there is no dispute with regard to whether TXO is a "qualified" applicant as that term is used in the regulations at 43 C.F.R., Subpart 3102 (1981), final action on the company's applications will result in the issuance of leases.

The record in this case does not disclose whether there are any applications for the Malmstrom lands that are junior to those filed by TXO. To the extent that there may be such applications that were filed after September 21, 1978, in reliance on the Secretary's 1977 notice of proposed rulemaking, they will not be accorded a priority because TXO has the *statutory* priority as the applicant that was first to file.

**III. CONCLUSION**

This case very likely would not have arisen if the Secretary had pursued a consistent policy of rejecting mineral lease applications before there had been a public announcement that particular parcels of land were available for leasing. And it assuredly would not have arisen if the Secretary had not engaged in a hasty attempt, based on politically suspect motives at worst and on a legally erroneous theory at best, to undo what had been done. As matters stand, TXO must have its twenty Fort Chaffee leases, and it must be returned to its place at the head of the queue for leases at Malmstrom Air Force Base.

The judgments appealed from are

*Reversed.*