**ARKLA EXPLORATION CO., et al., Plaintiffs,**

**v.**

**James G. WATT, Secretary of the United States Department of the Interior, and Texas Oil and Gas Corp., Defendants.**

**Civ. No. 82–2168.**

United States District Court,
W. D. Arkansas,
Fort Smith Division.

Sept. 20, 1982.

Jim Guy Tucker, Mitchell, Williams & Selig, Little Rock, Ark., Alan S. Novins, Lee Ellen Helfrich, Lobel, Novins & Lamont, Washington, D. C., Robert Roberts, III, Blanchard, Walker, O'Quin & Roberts, Shreveport, La., for plaintiff, Arkla Exploration Co.

Steve Clark, Atty. Gen. and Roger W. Giles, Asst. Atty. Gen., Little Rock, Ark., for plaintiff-intervenor, State of Ark.

W. Asa Hutchinson, U. S. Atty., Fort Smith, Ark., Andrew F. Walch, Patricia J. Beneke, Land and Natural Resources Div., Washington, D. C., Mark K. Seifert, Energy and Resources Division, Dept. of the Interior, Washington, D. C., for defendant, James G. Watt.

Bradley D. Jesson, Robert T. Dawson, Hardin, Jesson & Dawson, Fort Smith, Ark., Craig R. Carver, Gibson, Dunn &

Crutcher, Denver, Colo., for defendant, Texas Oil and Gas Corp.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, District Judge.

### I. *Historical Background and Factual Summary*

Congress first authorized mineral exploration and development of government land in 1920, when it gave the Secretary discretionary authority to open "public domain lands" to leasing. 30 U.S.C. §§ 181–263. In 1947 Congress authorized mineral leasing on lands "acquired" by the federal government from private owners. 30 U.S.C. §§ 351–359. Under the 1947 Act, lands acquired by the United States and set apart for military or naval purposes were excluded from leasing. 30 U.S.C. § 352.

Pursuant to the exclusion of military lands, Department of the Interior regulations tracked the exclusion and prohibited any mineral leasing on military lands. 43 C.F.R. § 3101.2–1(f). In 1976 Congress removed the exclusion from the statute, thus making military lands subject to availability for leasing at the Secretary's discretion. 30 U.S.C. § 352 (Federal Coal Leasing Amendments Act of 1975). The Department of the Interior failed to contemporaneously alter its regulations which prohibited mineral leasing.

In 1977, the Bureau of Land Management began the process of changing its pre-1976 regulations. The Bureau published a notice of proposed rulemaking in the Federal Register, proposing to alter Regulation 3101.2–1 so as to reflect the 1976 Amendments. *See* 42 Fed.Reg. 46,558 (1977). The 1977 Notice declared that the proposed rule would authorize the Department of the Interior to lease lands acquired for military or naval purposes, reflecting the authority granted by the Federal Coal Leasing Amendments Act, increasing the amount of land available for oil and gas leasing. The "Supplementary Information" of the 1977 Notice declared that the regulatory prohibition reflecting the old statutory provision remained in effect, serving as an exercise of the Secretary's authority to lease or not to lease such lands. The regulatory amendments became effective in September, 1978. *See* 43 Fed.Reg. 37,202 (1978).

In May of 1977, Texas Oil and Gas Corp. (TXO) filed applications with the Bureau of Land Management for noncompetitive oil and gas leases on lands at Fort Chaffee. It was four months later that the Bureau began to change the pre-1976 regulations.

Even though the 1977 Notice had frozen any leasing until the rulemaking was completed, the Bureau proceeded to process TXO's applications.

In August of 1977, the Department of Energy Organization Act, 42 U.S.C. § 7152, transferred the authority to promulgate regulations under the Mineral Lands Leasing Act and the Mineral Leasing Act for Acquired Lands from the Secretary of the Interior to the Secretary of Energy, for the purpose of fostering competition for federal leases. The Department of Energy Organization Act requires the Secretary of the Interior to afford the Secretary of Energy at least thirty (30) days to disapprove any term or condition which related to any matter with respect to any matter within the new purview of the Secretary of Energy.

On June 26, 1979, TXO's applications, dated May 6, 1977, were accepted by the Chief, Division of Lands and Minerals, Bureau of Land Management, on behalf of the United States and with the consent of the Corps of Engineers, and twenty (20) leases were issued to TXO with an effective date of July 1, 1979.

Arkla filed a "protest" of the Secretary's issuance of these leases on September 17, 1979, and four days later filed suit in the District Court for the District of Columbia and the Western District of Arkansas. Subsequently, on September 20, 1979, the Secretary directed the U. S. Geological Survey of the Bureau of Land Management to re-evaluate its non-KGS classification of the leased land. Consequently, TXO sought a temporary restraining order on November 1, 1979. The TRO hearing was scheduled for November 2, 1979. On the evening of

November 1, the Secretary issued a decision in which he cancelled the twenty (20) Fort Chaffee leases and rejected all pending applications that had been filed prior to September 21, 1978, the effective date of the Department's new regulations in accordance with the 1976 amendment to the Mineral Leasing Act for Acquired Lands, and further declared a moratorium on the leasing of all acquired military lands pending full re-evaluation of the leasing procedures.

Arkla's "protest" was then dismissed as moot. TXO subsequently amended its complaint to convert the suit to one for permanent relief.

The District Court for the District of Columbia issued two memorandum opinions on September 25, 1980, *Texas Oil and Gas Corp. v. Andrus*, 498 F.Supp. 668 (D.D.C. 1980), finding for the Secretary on his cross-motions for summary judgment. The decisions were consolidated for appeal.

The United States Court of Appeals for the District of Columbia reversed on June 11, 1982, holding that the Secretary, in cancelling the leases, acted in excess of his authority. The court reasoned that the 1976 Amendments made the lands in question immediately subject to leasing, without any regulatory implementation being necessary.

On July 30, 1982, the District Court was mandated to issue an order directing the Secretary of the Interior to reinstate the leases.

On August 4, 1982, Arkla refiled the instant action raising issues not considered by the District of Columbia courts, seeking equitable and declaratory relief.

Subsequently, the government stipulated, with the approval of TXO and all parties, to take no action to change the status of the matter until at least September 30, 1982.

Both the government and TXO moved to dismiss Arkla's complaint, raising issues of standing, unavailability of a private cause of action, collateral estoppel, exhaustion, and statute of limitations. The Court, after consideration of the briefs submitted, orally advised the parties of the Court's intention to deny the motions to dismiss.

Subsequently, the State of Arkansas moved to intervene, as well as Greenwood School District No. 25, Lavaca School District No. 3, Charleston School District No. 9, and Fort Smith Special School District. On September 9, 1982, the Court orally advised the parties that the State of Arkansas would be permitted to intervene, but that the motions of the school districts for intervention were to be denied.

The government and TXO also moved to limit this Court's review to the administrative record. After reviewing the arguments, the Court advised the parties that review would be limited to the record, but that the record could be supplemented as necessary to show the adequacy or inadequacy of the facts considered by the Secretary as well as the procedures utilized by the Secretary in reaching his decisions, and to provide the Court with sufficient technical expertise to allow the Court to understand the complex factual issues presented.

Pursuant to these rulings, the Court issues this Memorandum Opinion. The issues raised will be discussed in turn.

## II. *Discussion*

### A. *Standing*

The government and TXO assert that Arkla lacks standing to seek this Court's review, relying primarily upon *Geosearch v. Andrus*, 508 F.Supp. 839 (D.Wyo. 1981), and *Pullman v. Chorney*, 509 F.Supp. 162 (D.Colo.1981), among others,

In *Geosearch, supra*, the District Court of Wyoming found standing lacking. In that case, the plaintiff, Geosearch, was an organization which actively searched for defects in the offer of the first drawee of non-KGS tracts of land for oil and gas leases. If their protest was successful, and if the lease was reissued to the second drawee, Geosearch retained a percentage in the lease. However, the first drawees had previously assigned the leases to *bona fide* purchasers in several of the situations presented, and in others had failed to timely file a "protest."

Standing was found lacking because:

In order to have standing, Geosearch must prove that it has an injury in fact that is likely to be redressed by a favorable decision of the court. *Citizens Concerned For Separation of Church and State v. City and County of Denver,* 628 F.2d 1289 (10th Cir. 1980); *Duke Power Co. v. Carolina Env. Study Group, Inc.,* 438 U.S. 59 [98 S.Ct. 2620, 57 L.Ed.2d 595] (1978). *See also Data Processing Service v. Camp,* 397 U.S. 150 [90 S.Ct. 827, 25 L.Ed.2d 184] (1970). Even if Geosearch could demonstrate any irregularities in the issuance of the leases to the first drawees, and this Court does not so hold, the leases, if cancelled, would not be reissued to Geosearch. Under the regulations, the cancelled leases would be withdrawn, offered at a competitive bid or subjected to a new simultaneous drawing. *See* 43 C.F.R. § 3112.1. Geosearch cannot demonstrate any injury in fact and, therefore, has no standing.

*Id.* at 845.

Thus, because the court was unable to award the relief requested and because Geosearch claimed an abstract right to the leases, standing was lacking.

In *U.S. v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254, the Supreme Court held that:

"Injury in fact" reflects the statutory requirement that a person be "adversely affected" or "aggrieved," and it serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem. We have allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote, *see Baker v. Carr,* 369 U.S. 186 [82 S.Ct. 691, 7 L.Ed.2d 663]; a $5 fine and costs, *see McGowan v. Maryland,* 366 U.S. 420 [81 S.Ct. 1101, 6 L.Ed.2d 393]; and a $1.50 poll tax, *Harper v. Virginia Bd. of Elections,* 383 U.S. 663 [86 S.Ct. 1079, 16 L.Ed.2d 169]. While these cases were not dealing specifically with § 10 of the APA, we see no reason to adopt a more restrictive interpretation of "adversely affected" or "aggrieved." As Professor Davis has put it: "The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing and the principle supplies the motivation." Davis, STANDING: TAXPAYERS AND OTHERS, 35 U. CHI. L. REV. 601, 613. *See also* K. Davis, ADMINISTRATIVE LAW TREATISE §§ 22.09–5, 22.09–6 (Supp.1970).

Thus, in *SCRAP,* the Supreme Court seemed to equate "injury in fact" with "aggrieved" or "adversely affected."

■ The Court has recently refined its position, declaring in *Valley Forge v. Americans United,* —— U.S. ——, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982):

Respondents also claim standing by reference to the Administrative Procedure Act, 5 U.S.C. § 702 (1976), which authorizes judicial review at the instance of any person who has been "adversely affected or aggrieved by agency action within the meaning of a relevant statute." Neither the (APA), nor any other congressional enactment, can lower the threshold requirements of standing under Art. III. *See, e.g., Gladstone, Realtors v. Village of Bellwood,* 441 U.S. [91] at 100 [99 S.Ct. 1601 at 1608, 60 L.Ed.2d 66]; *Warth v. Seldin,* 422 U.S. [490] at 501 [95 S.Ct. 2197 at 2206, 45 L.Ed.2d 343]. Respondents do not allege that the Act creates a legal right, "the invasion of which creates standing," *Linda R.S. v. Richard D.,* 410 U.S. [614] at 617 n. 3 [93 S.Ct. 1146 at 1148 n. 3, 35 L.Ed.2d 536] and there is no other basis for arguing that its existence alters the rules of standing otherwise applicable to this case.

It is clear that "Congress may enact statutes which create legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R. S., supra.*

■ Regardless of the language used, the true test of standing is whether the parties seeking to invoke the court's jurisdiction have alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens

the presentation of issues upon which the court so largely depends for illumination of difficult questions.

In *Pullman v. Chorney, supra,* the court was faced with a challenge to allegedly fraudulently submitted multiple applications for oil or gas leases, which illegally reduced the probability that the plaintiff's application would be drawn. The court had little problem in concluding that plaintiff met the requirement of "injury in fact":

> Although the plaintiff asserts his claim in various terms, the basic interest to which he claims actual injury is the right to have the drawing for leases under the SOG system be conducted fairly. *Clearly, by alleging that the private defendants fraudulently submitted multiple applications, which illegally reduced the probability that the plaintiff's application would be drawn, the plaintiff has in a sense alleged that the interest he asserts has suffered actual injury.* (emphasis added)

*Id.* at 166.

Standing was denied because there was no causal relationship between the injury and the court's power to remedy it.

> Even assuming that the plaintiff has alleged a "distinct and palpable injury," however, this Court cannot perceive that the plaintiff has established the requisite connection between the claimed injury and the challenged conduct, or, as that requirement has also been stated, "that the exercise of the Court's remedial powers would redress the claimed injuries."

■ Arkla's asserted right is the right to bid competitively on KGS tracts of land which the Secretary has reasonably classified and offered. Correlatively, they assert the rights to have the lands not classified arbitrarily, to have the Secretary utilize his discretion properly, and the right to bid for all properly categorized and offered KGS lands for potential profit and exploratory public benefit. Further, Arkla seeks correction of an alleged situation whereby they were practically defrauded by the Bureau of Land Management into believing that the Fort Chaffee lands were not available

for lease. The leases were shortly thereafter leased to TXO, despite Arkla's longstanding avid interest in the lands and continual contact with the Bureau. Additionally, not only does Arkla contend that their efforts to acquire the land were irrationally refused, but that the Secretary acted in excess of his authority by violating the Department of. Energy Organization Act, 42 U.S.C. § 7152, in failing to notify the Secretary of Energy at least thirty days prior to the issuance of gas leases, in order to enable him to exercise his responsibilities to promote competition for the leases.

We think the evidence submitted shows a substantial likelihood exists that Arkla has been harmed by the procedures employed herein.

In *Bryant v. Yellen,* 447 U.S. 352, 100 S.Ct. 2232, 65 L.Ed.2d 184 (1980), the Supreme Court held that residents of California's Imperial Valley had standing to intervene on appeal from an order that ruled against the government in an action to declare that irrigation water could not be used for landholdings in excess of 160 acres. The fact that the intervenors could not establish with certainty that they would be able to purchase excess lands if their position prevailed did not defeat standing since purchasers of the land would stand to reap substantial windfall profits on resale. This ruling seems to rest on the potential and likely benefit from a favorable decision, with no more than a very attenuated notion of injury in fact from the practices challenged.

If an "identifiably trifling" interest in economic, aesthetic, conservational and recreational benefits which is substantially likely to be "injured" is sufficient, *see, e.g., Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and *SCRAP, supra,* then hypertechnical constructions couched in eloquent phraseology should not be allowed to effectively defeat a remedy when a wrong is apparent.

■ Thus, while this Court recognizes the ingenuity of the arguments advanced by TXO and the government on this issue, the

simple fact is that this Court will not lightly deny standing when (1) there is a causal connection between the claimed injury and the challenged conduct; (2) a substantial likelihood exists that the relief requested may redress the injury suffered; and (3) there is such a palpable injury present that millions of dollars may be affected by the actions complained of. Under these circumstances the Court would feel remiss in its duties in proclaiming that the situation herein presented is abstract and hypothetical. Very rarely will there be a more concrete, adverse litigation "upon which the Court depends for resolution of complicated issues."

■ The interest of the State of Arkansas in this matter is, or should be, obvious. Pursuant to 30 U.S.C. §§ 191, 355, the State of Arkansas will receive *fifty per cent* (50%) of all money received from sales, bonuses, royalties, and rentals of the public lands involved in this litigation. Clearly, if the Fort Chaffee tracts are irrationally classified as non-KGS areas, the State will lose one-half of all the money which would have been received from the rental of these lands, which, instead, will accrue to the benefit of whichever oil corporation is involved. Conversely, if the tracts are KGS lands, the State of Arkansas stands to gain tens of millions of dollars from a correct and adequate classification procedure in accordance with law. This being so, in view of the foregoing, we have no rational choice except to find that the State of Arkansas has met the standing requirements in this case.

While this Court has not the power to compel the Secretary to offer the lands on a competitive basis, this Court may void the present leases and require the Secretary to make a decision which is well-reasoned and in accordance with law. Since it appears that the policies behind the Mineral Leasing Act and its amendments, the Department of Energy Organization Act, and the history and policy of the Department of the Interior, clearly favor the issuance of the leases competitively where exploration interest is already present, we find that there is a substantial likelihood that the correct resolution of this litigation will afford the parties the relief sought.

**B.** *Availability of a Cause of Action*

■ Having concluded that the State of Arkansas and Arkla have standing to challenge the agency action involved, the Court will discuss the necessity and availability of a cause of action applicable to both plaintiffs.

It has been held, repeatedly, that District Courts have jurisdiction to review final agency action of the Department of the Interior, whether under 5 U.S.C. §§ 702, 704, or 28 U.S.C. § 1331. *See generally Adams v. Witmer,* 271 F.2d 29 (9th Cir. 1958); *Coleman v. U. S.,* 363 F.2d 190 (9th Cir. 1966); *Moseley v. Hickel,* 442 F.2d 1030 (9th Cir. 1971); *Roberts v. Morton,* 389 F.Supp. 87, aff'd, 549 F.2d 158 (10th Cir. 1977); *Shell Oil Co. v. Kleppe,* 426 F.Supp. 894 (D.Colo.1977); *Andrus v. Charlestone Stone Products Co.,* 436 U.S. 604, 98 S.Ct. 2002, 56 L.Ed.2d 570.

Arkla, beyond doubt, qualifies as an aggrieved party adversely affected by the agency action challenged herein. Further, even if such were not the case, 30 U.S.C. § 226–2, the statute of limitations provision, clearly implies that judicial review is to be allowed. And finally, 30 U.S.C. §§ 191, 355 seem to allow for such an implied right of action by any person affected by the funding schemes.

30 U.S.C. § 191 provides:

All money received from sales, bonuses, royalties, and rentals of the public lands . . . shall be paid into the Treasury of the United States; 50 *per centum* thereof shall be paid by the Secretary of the Treasury . . . to the State . . . to be used by such State and its subdivisions, as the legislature of the State may direct giving priority to those subdivisions of the State socially or economically impacted by development of minerals leased under this Act, for (i) planning, (ii) construction and maintenance of public facilities, and (iii) provision of public service; . . .

Considering the four factors listed in *Cort v. Ash,* 422 U.S. 66, at 78, 95 S.Ct. 2080, at 2087–88, 45 L.Ed.2d 26, in relation to the entire statutory scheme presented here, it is clear that a cause of action is available to enforce the payments due. This implies that the State may attack allegedly capricious determinations by the agency which affect the State's payments greatly, because, when considered as a whole, it is clear that the right asserted is within the zone of interests regulated by the entire legislation.

In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. *First,* is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," *Texas & Pacific R. Co. v. Rigsby,* 241 U.S. 33, 39 [36 S.Ct. 482, 484, 60 L.Ed. 874] (1916) (emphasis supplied)— that is, does the statute create a federal right in favor of the plaintiff? *Second,* is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? *See, e.g., National Railroad Passenger Corp. v. National Assn. of Railroad Passengers,* 414 U.S. 453, 458, 460 [94 S.Ct. 690, 693, 694, 38 L.Ed.2d 646] (1974) (*Amtrak*). *Third,* is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? *See, e.g., Amtrak, supra; Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 423 [95 S.Ct. 1733, 1740, 44 L.Ed.2d 263] (1975); *Calhoon v. Harvey,* 379 U.S. 134 [85 S.Ct. 292, 13 L.Ed.2d 190] (1964). And *finally,* is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? *See Wheeldin v. Wheeler,* 373 U.S. 647, 652 [83 S.Ct. 1441, 1445, 10 L.Ed.2d 605] (1963); *cf. J. I. Case Co. v. Borak,* 377 U.S. 426, 434 [84 S.Ct. 1555, 1560, 12 L.Ed.2d 423] (1964); *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 394–395 [91 S.Ct. 1999, 2003–04, 29 L.Ed.2d 619]; *id.* at 400 [91 S.Ct. at

2006] (Harlan, J., concurring in judgment).

*Cort v. Ash, supra.*

Accordingly, the Court concludes that the instant action is cognizable in the District Courts of the United States.

In short, Arkla may be heard in this matter as a matter of administrative law of general applicability, and the State may do so to protect its rights granted by federal law.

### C. Collateral Estoppel

■ Both TXO and the government argue that Arkla is collaterally estopped from litigating the issues presented because the validity of the leases issued noncompetitively to TXO was litigated in the District Court for the District of Columbia and an appeal in the Court of Appeals for the District of Columbia Circuit (*see Texas Oil and Gas Corp. v. Watt,* 683 F.2d 427 (D.C. Cir.1982); *Texas Oil and Gas Corp. v. Andrus,* 498 F.Supp. 668 (D.D.C.1980).

Arkla was involved in that litigation, but as *amicus curiae,* their motion for intervention having been denied.

In *Oldham v. Pritchett,* 599 F.2d 274, 278–279 (8th Cir. 1979), the Eighth Circuit Court of Appeals discussed the four-pronged test for the applicability of the doctrine of collateral estoppel, earlier approved in *Gerrard v. Larsen,* 517 F.2d 1127 (8th Cir. 1975). Said the Court:

As a branch of the doctrine of res judicata, collateral estoppel serves both judicial and private interests in the termination of litigation. In the context of the judicial system, collateral estoppel principles serve primarily to conserve time and resources; at the same time, the application of collateral estoppel is a means by which a litigant may evade unnecessary expenses and potential harassment by lawsuit, and avoid conflicting rights and duties arising from inconsistent judgments. *Johnson v. United States,* 576 F.2d 606, 609–10 (5th Cir. 1978); *Southwest Airlines Co. v. Texas International Airlines,* 546 F.2d 84, 94 (5th Cir. 1977); *Bruszewski v. United States,* 181 F.2d

419, 421 (3d Cir. 1950), *cert. denied,* 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950).

Traditionally, courts have required "mutuality" between parties as a condition to the application of collateral estoppel. 1B Moore's Federal Practice ¶ 0.412[1] at 1803–04. The doctrine of "mutuality" requires that "the party invoking the judgment must similarly be bound to it either as *party* or as a *privy.*" 1B Moore's Federal Practice ¶ 0.441[3] at 3781. The more recent trend, however, has been to eliminate strict "mutuality" as a condition to the application of collateral estoppel. *Montana v. United States,* [440] U.S. [147], 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979); *Cramer v. General Tel. & Electronics Corp.,* 582 F.2d 259, 267–68 (3d Cir. 1978); *Johnson v. United States,* 576 F.2d 606, 614 (5th Cir. 1978); *Speaker Sortation Systems, Division of A–T–O, Inc. v. United States Postal Service,* 568 F.2d 46, 48–49 (7th Cir. 1978); *accord, Griffin v. Burns,* 570 F.2d 1065, 1072 (1st Cir. 1978); *Windham v. American Brands, Inc.,* 565 F.2d 59, 69 n. 30 (4th Cir. 1977); *Clark v. Watchie,* 513 F.2d 994, 998 n. 6 (9th Cir. 1975); *see Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 324–327, 91 S.Ct. 1434 [1440–1442], 28 L.Ed.2d 788 (1970); Restatement (Second) Judgments, Appendix § 88, Comment b at 162–63 (Tent. Draft No. 3, 1976); *see also* Currie, *Mutuality of Collateral Estoppel; Limits of the Bernhard Doctrine,* 9 Stan.L.Rev. 981 (1957). This shift toward a more functional approach to the application of collateral estoppel has similarly resulted in the demise of the companion rule to "mutuality," the requirement of strict "adversity" between parties. *Scooper Dooper, Inc. v. Kraftco Corp.,* 494 F.2d 840 at 845 (3rd Cir.) 1B Moore's Federal Practice, ¶ 0.411[2] at 1314. Since Justice Traynor's seminal opinion in *Bernhard v. Bank of America Nat. Trust & Savings Assn.,* 19 Cal.2d 807, 122 P.2d 892 (1942), many jurisdictions permit nonparties to prior actions to rely on the judgment as a defense to a subsequent action brought by a party to the prior litigation. *See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1970); Note, *Collateral Estoppel of Non-Parties,* 87 Harv.L.Rev. 1485 (1974). If a stranger to the prior litigation may invoke estoppel as a defense, then *a fortiori* a co-party in the prior action ought to be able to preclude a former co-party from relitigating issues finally adjudicated in the prior lawsuit. *Scooper Dooper, Inc. v. Kraftco Corp.,* 494 F.2d at 845.

In *Gerrard v. Larsen,* 517 F.2d 1127, 1131–32 (8th Cir. 1975), this Court recognized the general erosion of strict "mutuality" between parties as a requisite to the application of collateral estoppel in its defensive context. *See Garrigan v. Giese,* 553 F.2d 35, 36–37 n. 2 (8th Cir.). The *Gerrard* court, in discussing whether federal or state law should be applied in determining the collateral estoppel effect of an issue adjudicated in a prior diversity action, found it unnecessary to resolve the issue because the defensive assertion of collateral estoppel could have been accomplished under either body of law. *Id.* at 1132. The *Gerrard* court proceeded on the basis that estoppel was appropriate where: (1) the issue was identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue. *Gerrard v. Larsen,* 517 F.2d at 1130; *see Parklane Hosiery Co. v. Shore,* [439 U.S. 322] 99 S.Ct. [645] at 652 [58 L.Ed.2d 552]; *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. at 328, 91 S.Ct. 1434 [at 1442]. We believe that this analysis may appropriately be applied to the circumstances of the present case. The Court's adoption of the *Gerrard* four-part test for the application of collateral estoppel additionally forecloses the issue of whether the Oldhams and Pritchett were "adverse" as co-parties in the proceeding.

We agree with the reasoning of the Third Circuit that "[the] nullification of the mutuality requirement renders non-adversity irrelevant to the doctrine of collateral estoppel." *Scooper Dooper, Inc. v. Kraftco Corp.,* 494 F.2d at 845.

TXO argues that, inasmuch as all of the counts contained in Arkla's complaint relate to the general issue of the legal validity of the Secretary's decision to issue the leases, and since that question has been decided by the District of Columbia Court of Appeals, Arkla should not be able to relitigate the question.

However, the Court of Appeals for the District of Columbia Circuit held only that the Secretary's own regulations did not require him to cancel the leases. The Secretary had argued that under 43 C.F.R. § 2091.1, the public land laws came into effect only when he exercised his discretion whether to allow leasing of certain lands. 43 C.F.R. § 2091.1 requires the rejection of applications for leases if "for any reason the land has not been made subject, or restored, to the operation of the public land laws." Under then-existing regulations, his discretion to lease the lands required prior published notice in the Federal Register. The District of Columbia Court of Appeals concluded that 30 U.S.C. § 352 (1976) (The Coal Leasing Amendments Act of 1975) made the Fort Chaffee lands immediately subject to the "operation of the public land laws" without the necessity of regulations implementing the new legislation and without any announcement or notice as was theretofore required.

Clearly, as Arkla was neither a party to the prior litigation nor in "privity" with a party, and inasmuch as Arkla raises new issues not litigated in the previous proceedings, the *Gerrard* test forbids the application of the doctrine of collateral estoppel in the instant action. Accordingly, Arkla's claims are not barred.

### D. *Exhaustion of Administrative Remedies*

As noted, Arkla filed a "protest" of the Secretary's issuance of these leases on September 17, 1979. On September 20, 1979, the Secretary directed the U. S. Geological Survey to re-evaluate its classification of the leased land. On November 1, 1979, the Secretary cancelled the twenty leases and declared a moratorium on the leasing of all acquired military lands.

43 C.F.R. § 4.21 sets forth General Rules Relating to Procedures and Practice in the administrative bodies:

(a) *Effect of decision pending appeal.* Except as otherwise provided by law or other pertinent regulation, a decision will not be effective during the time in which a person adversely affected may file a notice of appeal, and the timely filing of a notice of appeal will suspend the effect of the decision appealed from pending the decision on appeal. However, when the public interest requires, the Director or an Appeals Board may provide that a decision or any part of it shall be in full force and effect immediately.

(b) *Exhaustion of administrative remedies.* No decision which at the time of its rendition is subject to appeal to the Director or an Appeals Board shall be considered final so as to be agency action subject to judicial review under 5 U.S.C. § 704, unless it has been made effective pending a decision on appeal in the manner provided in paragraph (a) of this section.

We think it clear that, as the Secretary reversed his issuance of the leases to TXO and Arkla's appeal was subsequently dismissed as "moot," Arkla has timely and diligently pursued whatever administrative remedies that were available.

Since the Secretary is now subject to the direction of the District of Columbia Court of Appeals to reinstate TXO's leases, it is clear that any further administrative appeal would be futile, as the Secretary presently has no real choice as to which course to follow. It is well-settled that exhaustion is not required when to require exhaustion would be futile. *U.S. ex rel. Marrero v. Warden,* 483 F.2d 656 (3rd Cir. 1974), *rev'd on other grounds,* 417 U.S. 653, 94 S.Ct. 2532, 41 L.Ed.2d 383; *Wolff v. Selective*

*Service Local Board # 16,* 372 F.2d 817 (2nd Cir. 1967).

In *United States v. Newmann,* 478 F.2d 829 (8th Cir. 1973), the Eighth Circuit utilized a balancing test

> which weighed the interests of the (plaintiff) against three specified governmental interests in requiring exhaustion ... (a) the agency's interest in having an opportunity to make a factual record and exercise its discretion and expertise without the threat of litigious interruption; (b) the agency's interest in discouraging frequent and deliberate flouting of the administrative process; and (c) the agency's interest in correcting its own mistakes and thereby obviating unnecessary judicial proceedings.

*Id.* at 831.

No interests on anyone's behalf would be served by requiring Arkla and the State of Arkansas to further pursue administrative remedies. Accordingly, as Arkla has in fact avidly pursued administrative remedies when required and available, and as further administrative proceedings would be futile and of no benefit to anyone, we conclude that the exhaustion doctrine does not preclude the present action.

### E. Statute of Limitations

 Both the government and TXO argue that Arkla's present action is not timely.

30 U.S.C. § 226–2 provides:

> No action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter.

As noted, under 43 C.F.R. § 4.21, Arkla was no longer "adversely affected" once the Secretary reversed his issuance of the leases. Not only did Arkla not have to further pursue administrative proceedings, it could not, *i.e.,* its case was "moot."

Additionally, 30 C.F.R. § 290.7 provides: Any party to a case adversely affected by a final decision of the Director, Geological Survey, or the Commissioner of Indian Affairs under this part shall have a right of appeal to the Board of Land Appeals.

Thus, it is clear that Arkla was not "adversely affected" by a "final decision" until the Secretary's issuance of the leases was ordered reinstated, at the earliest.

Any other construction of the applicable law would have the effect of allowing the Secretary to "stay" any adverse decisions until the statute of limitations expired, precluding any challenge altogether. This is plainly not the intent of Congress. Accordingly, we conclude that Arkla's action is timely, and that no further administrative proceedings are required.

### F. Intervention

Several parties, the State of Arkansas, Greenwood School District No. 25, Lavaca School District No. 3, Charleston School District No. 9, and the Fort Smith Special School District, have sought leave to intervene in this matter.

Rule 24, Fed.R.Civ.P., provides:

> (a) Upon timely application anyone shall be permitted to intervene in an action:
> . . .
> (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

The State of Arkansas, for various reasons not important here, asserts claims of title to some of the lands in question, as well as to the oil and gas rights to those lands. Clearly, they have properly met the requirements of Rule 24(a) governing intervention of right. Although the trial of this cause will be bifurcated so as to allow the expeditious presentation and adjudication of the injunctive relief sought, the State of Arkansas is properly in this lawsuit. The government does not oppose the intervention of the State of Arkansas.

Rule 24(b) governs permissive intervention. It provides:

(b) Upon timely application anyone may be permitted to intervene in an action: . . .

(2) when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unusually delay or prejudice the adjudication of the rights of the original parties.

Although Arkla seeks to enforce its right to bid for offered KGS lands for potential profit, the State seeks to enforce the public interest. Thus, whether by virtue of Rule 24(a) or (b), this Court feels that inasmuch as the same issues of fact and law are involved in the State's claims as in Arkla's and since the intervention by the State will not significantly delay or prejudice the rights of the original parties, the motion to intervene of the State of Arkansas should be granted. We foresee no appreciable degree of prejudice to TXO, the only party opposing the State's intervention.

As for the school districts, however, it is beyond question that any intervention would be permissive, under Rule 24(b). As their asserted claims are practically identical to those of the State and derivative of those of the State, the Court finds that the addition of further parties to this action would delay and complicate the prompt adjudications of the parties' respective interests and would add very little to this Court's efforts to achieve the correct resolution of the issues presented. The school districts' interests are adequately protected by the State of Arkansas and Arkla.

Thus, we conclude that the motions of the school districts to intervene should be denied.

### G. *Scope of Review*

TXO and the government contend that any review by this Court would necessarily be confined to the administrative record. This is, of course, the general rule.

In *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), the Supreme Court said, at p. 141, 93 S.Ct. at p. 1243–44:

It is quite plain from our decision in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402 [91 S.Ct. 814, 28 L.Ed.2d 136] (1971), that *de novo* review is appropriate only where there are inadequate fact-finding procedures in an adjudicatory proceeding, or where judicial proceedings are brought to enforce certain administrative actions.

TXO argues that this exception is not applicable because the proceedings employed by the Secretary require no adjudicatory hearing in fixing the boundaries of a KGS. That no adjudicatory proceedings are at issue is the crux of TXO's argument.

In response, Arkla and the State assert that even though no "hearing" *per se* was granted or required, this gives rise to no inference that the procedures were not adjudicatory in nature. 5 U.S.C. § 554(a)(3) exempts "adjudications" involving proceedings in which decisions which rest solely on "inspections, tests, or elections" from the ordinary hearing requirements, even though adjudicatory in nature. Arkla and the State argue that the KGS classification is an informal adjudicatory proceeding based solely on inspections or tests, as applied to applicants for leases.

"Adjudication" is the agency process for the formulation of an "order." 5 U.S.C. § 551(7). "Order" is defined as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than 'rulemaking,' but including licensing." 5 U.S.C. § 551(6).

"Rulemaking" is the agency process for formulating, amending or repealing a "rule." 5 U.S.C. § 551(5). "Rule" is defined as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret or prescribe law or policy, or describing the organization, approval or prescription for the future of rates, wages, corporate or financial structures or organizations thereof, prices, facilities, appliances, services or allowances therefore, or of valuations, costs, or accounting, or practices bearing on any of the foregoing."

Courts have had trouble interpreting this bureaucratic "gobbledegook" and have instead used the English language equivalent:

Where a federal administrative agency makes law as a legislature would, it is rulemaking under the APA. When it makes law as a court would, it is adjudicatory in nature.

*N.L.R.B. v. A.P.W. Products Co.,* 316 F.2d 899 (2nd Cir. 1963).

. . . adjudicative facts, which are those that immediately affect only specific litigants, must be resolved on the basis of evidentiary submissions. . . .

*Patagonia Corp. v. Bd. of Governors of Federal Reserve System,* 517 F.2d 803 (9th Cir. 1975).

The cases which have addressed the review of decisions of the Secretary of the Interior with respect to mining and mineral claims have applied the general rule and held that review is limited to the administrative record, *Multiple Use, Inc. v. Morton,* 504 F.2d 448 (9th Cir. 1974); *Doria Mining & Engineering Corp. v. Morton,* 420 F.Supp. 837 (C.D.Cal.1976); *Roberts v. Morton,* 389 F.Supp. 87 (D.Colo.1975); *Adams v. United States,* 318 F.2d 861 (9th Cir. 1963); *Coleman v. United States,* 363 F.2d 190 (9th Cir. 1966); *Denison v. Udall,* 248 F.Supp. 942 (D.Ariz.1965); *Foster v. Jensen,* 296 F.Supp. 1348 (C.D.Cal.1966), although the Secretary is frequently reversed.

This Court has no desire to substitute its judgment for that of the Department of the Interior, however attractive that objective may be made to appear. However, the Court would be wholly unable to apply the "arbitrariness" test without sufficient information as to the technical expertise involved. Thus, for example in *Hiatt Grain & Feed, Inc. v. Bergland,* 446 F.Supp. 457 (D.Kan.1978), aff'd, 602 F.2d 929 (10th Cir. 1979), the district court permitted the parties to introduce outside "explanatory" evidence for this purpose, even though the case was not tried *de novo.* "The court, in reviewing the action, must determine whether all relevant factors were considered." *Id.* at 467. *See Independent Meat Packers Assn. v. Butz,* 526 F.2d 228, 238 (8th Cir. 1975). As the Court said in *Hiatt:*

How is the Court to determine whether all relevant factors were considered in the administrative record without knowing what factors outside the administrative record were not considered in the decision making process.

*Hiatt, supra,* at p. 467.

In *Hiatt,* the Court allowed evidence to be submitted for the following purposes: (1) to assist the Court to understand the complex issues presented; (2) allowing the Court to determine the adequacy of the administrative record; (3) for explanation of the administrative record.

In *Bunker Hill Co. v. Environmental Protection Agency,* 572 F.2d 1286 (9th Cir. 1977), the Eighth Circuit said:

. . . the Courts are not straightjacketed to the original record in trying to make sense of complex technical testimony, which is often presented in administrative proceedings without ultimate review by nonexpert judges in mind. Here, the augmenting materials were merely explanatory of the original record.

*Id.* at 1292.

And finally, it goes without saying that this Court must at least be able to ascertain the scope of the administrative record considered and the procedures employed, so that we will have a record to review.

Accordingly, we will base our decision on the administrative record and the cause will not be tried *de novo,* however, supplementary materials will be received to show the adequacy or inadequacy of the facts considered by the Secretary, to supply the Court with sufficient technical expertise to aid the Court in understanding the complex issues involved, and to show the true scope of the record and procedures employed by the Secretary in reaching his decision.

A separate order in accordance with this *memorandum opinion will be concurrently* entered.